Knowlton **MERRITT**,
Plaintiff-Appellant,

v.

John E. **MACKEY**, et al.,
Defendants-Appellees.

No. 85–4111.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 8, 1986.
Decided Sept. 16, 1987.

Stephen L. Brischetto, Portland, Or., and Robert D. Dames, Beaverton, Or., for plaintiff-appellant.

Judith D. Kobbervig, Portland, Or., and David Schuman, Salem, Or., for defendants-appellees.

Before WALLACE, FERGUSON and NORRIS, Circuit Judges.

FERGUSON, Circuit Judge:

Knowlton Merritt, a former counselor supervisor at Klamath Alcohol and Drug Abuse, Inc. (KADA), appeals the district

court's trial and summary judgment decisions in his civil rights action. He alleges that the defendants, federal and state officials evaluating KADA, and the United States, caused his termination from employment without a hearing, thereby depriving him of liberty and property interests without due process in violation of the Fifth and Fourteenth Amendments. We affirm in part, reverse in part, and remand for a new trial.

## I.

Knowlton Merritt began working for KADA as a counselor in 1976. KADA is a private nonprofit corporation providing treatment and support to alcohol and drug abusers. KADA had contracts with both Klamath County and the Indian Health Services ("IHS"), a federal agency, to provide alcohol and drug abuse services.

In 1981 state and federal officials, including defendants John Mackey and Steve Vincent, began evaluating KADA's management. The first evaluations found that KADA violated state regulations, and the final report, in February 1983, threatened the cut off of federal and state funding. Mackey wrote the final report after discussions with his supervisor and a federal contracting officer. The report conditioned further funding of KADA on the requirement that Merritt "must be relieved of his duties at the earliest possible date" and "must not be employed by KADA".

KADA, fearing the loss of funds, fired Merritt on March 17, 1983. Merritt appealed through the existing KADA grievance procedure. KADA informed Vincent and Mackey that its personnel policies gave it the burden of proving the reasons for Merritt's termination and requested such an explanation from them. No explanation was ever provided.

In September 1983 KADA requested Vincent and Mackey to reconsider their order to fire Merritt and to clarify whether KADA could rehire Merritt. Neither Vincent nor Mackey responded. KADA took no further action on Merritt's grievance, and Merritt pursued his grievance no further. Instead, he filed this action under 42 U.S.C. § 1983 and the Fifth Amendment, alleging liberty and property deprivations without due process.

Merritt timely appeals the district court's posttrial decisions that *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), barred his deprivation of property claim against Vincent and Mackey and that qualified immunity protected Vincent and Mackey from liability. He also appeals the district court's grant of summary judgment in favor of Vincent and Mackey on the ground that he did not state a liberty deprivation claim on which relief could be granted, and in favor of the United States on the ground that there is no private right of action under the Oregon criminal statute that prohibits tortious interference with employment.

## II.

Whether Merritt had a protected property right in his employment is a mixed question of fact and law. Where a mixed question "involve[s] the exercise of judgment about the values underlying legal principles," it is reviewable de novo. *United States v. McConney*, 728 F.2d 1195, 1204 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

To determine whether due process requirements apply to an asserted interest, the court must initially look to the nature of the interest at stake. *Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). It is indisputable that an individual may have a protected property interest in private employment. In *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), the Supreme Court noted that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Id.* at 492, 79 S.Ct. at 1411. *See also Phillips v. Bureau of Prisons*, 591 F.2d 966, 970 (D.C.Cir.1979); *United States v. Briggs*, 514 F.2d 794, 798 (5th Cir.1975).

 The dissent insists nevertheless that the interest which Merritt asserts is merely that of noninterference with a contractual

relationship. *Greene* makes clear, however, that when a private employee is deprived of his employment through government conduct, the cause of action available to the employee is not merely the right to sue for interference with contractual relationships.[1] The Court noted:

> [R]espondent's actions ... caused substantial injuries, and were they the subject of a suit between private persons, they could be attacked as an invasion of a legally protected right to be free from arbitrary interference with private contractual relationships. *Moreover, petitioner has the right to be free from unauthorized actions of government officials which substantially impair his property interests.*

360 U.S. at 493 n. 22, 79 S.Ct. at 1412 n. 22 (citation omitted; emphasis added). Thus, where the actions of private individuals operate to deprive an individual of his employment, a suit for interference with private contractual relationships would lie, but where government officials are involved, the nature of the interest at stake in private employment is a property interest.

■ The inquiry does not end here, however. For the purpose of due process, Merritt must show that he had more than a "unilateral expectation" of continued employment; he must demonstrate a "legitimate claim of entitlement." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. In determining whether there is an entitlement to the benefit in question, we look not to the Constitution but to "existing rules and understandings that stem from an outside source such as state law." *Id.* Thus, an employee may establish the existence of a property interest in continued employment by demonstrating a reasonable expectation based upon state law, rules or regulations concerning discharge or express or implied promises. *Id.* KADA's personnel policies stated that permanent employees could be fired only "for cause." Under Oregon law "just cause" policies can form part of the employment contract. *See Yartzoff v. Democrat-Herald,* 281 Or. 651, 658, 576 P.2d 356 (1978); *Kay v. North Lincoln Hospital District,* 555 F.Supp. 527, 529–30 (D.Or.1982). We conclude therefore that the district court correctly found that Merritt had a protected property interest in his continued employment with KADA. Thus, the Due Process Clause entitled Merritt to a meaningful hearing at a meaningful time to challenge any deprivation of that interest by the state or federal government.[2] *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 437, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982) (citation omitted); *Piatt v. McDonald,* 773 F.2d 1032, 1036 (9th Cir.1985) (en banc).

■ That KADA and not the government officials themselves terminated Merritt's employment does not change the nature of his protected property interest. Liability under 42 U.S.C. § 1983 attaches to any person who, under color of state law, "subjects or causes to be subjected" any person to a deprivation of protected rights. In *Johnson v. Duffy,* 588 F.2d 740 (9th Cir. 1978), this court noted that "[t]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743–44; *see also Arnold v. International Business Machines Corp.,* 637 F.2d 1350, 1355 (9th Cir.1981).

---

1. In *Greene,* an aeronautical engineer employed by a private manufacturer that produced goods for the armed services, brought suit against government officials when he was dismissed by his employer following the revocation by the government of his security clearance. *Greene* is therefore on all fours with the instant case inasmuch as it concerns the interest asserted by a private employee bringing suit against government officials whose conduct caused him to lose his private employment.

2. The section 1983 claim against Vincent, a state official, arises under the Fourteenth Amendment and the claim against Mackey, a federal official, arises directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Because the two claims require the same analysis, we do not differentiate between them.

As this court pointed out in *Castaneda v. U.S. Department of Agriculture*, 807 F.2d 1478 (9th Cir.1987), the Supreme Court in *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), explicitly left open the possibility that where the government indirectly yet intentionally injures or affects the legal status of a person by an action taken directly against a private third party, the injured person could maintain a due process challenge against the government. *Id.* at 789–90 n. 22, 100 S.Ct. at 2477 n. 22. It is clear on the facts before us that Merritt was the actual and intended victim of the agents' coercive dealings with KADA. Merritt therefore states a claim under section 1983 that he was deprived of his property interest in continued employment when the state and federal agents intentionally coerced KADA to fire him.

▮ The district court erroneously concluded that Merritt's right to due process would be satisfied by a postdeprivation remedy, following the Supreme Court's decision in *Parratt*. The Court in *Parratt* held that a postdeprivation remedy will satisfy due process when the deprivation is a result of a "random and unauthorized act," because "the loss is not a result of some established State procedure and the State cannot predict precisely when the loss will occur." 451 U.S. at 541, 101 S.Ct. at 1916. Thus, under the *Parratt* analysis, "the touchstone for predeprivation process is the feasibility of providing such process." *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir.1985) (en banc). The premise underlying *Parratt* is that "where the challenged deprivation is random and unauthorized, it is impracticable or impossible for the state to provide predeprivation process because the governmental machinery cannot foresee or predict random, unauthorized actions." *Bretz*, 773 F.2d at 1030. Consequently, as we stated in *Piatt*, *Parratt* reaches only situations in which the state

administrative machinery did not, and could not, have learned of the deprivation until after it has occurred. *Piatt*, 773 F.2d at 1036. Thus, the state must provide predeprivation process where the acts complained of are "deliberate, considered, planned or prescribed conduct ... whether or not such conduct is authorized." [3]

Vincent's and Mackey's conduct occurred as part of an institutionalized practice of evaluating the recipients of government funding. Mackey's and Vincent's respective supervisors were aware through ongoing discussions that Mackey and Vincent were planning to coerce KADA into firing Merritt, well before any such action was taken. It would therefore have been practicable for the state and federal authorities to have afforded Merritt some predeprivation process, as Mackey and Vincent's conduct was not random, even though it was contrary to official policy. Postdeprivation remedies satisfy due process only when the conduct at issue was both unauthorized *and* random. *See Parratt*, 451 U.S. at 541, 101 S.Ct. at 1916. The question is whether an injury is sufficiently predictable to make a predeprivation remedy practicable. *See Logan*, 455 U.S. at 435–36, 102 S.Ct. at 1157–58. Vincent's and Mackey's order to KADA to fire Merritt or lose state and federal funding was not random and the authorities could easily predict the injury to Merritt that would result. The district court erred therefore in holding that *Parratt* barred Merritt's property interest claim.

### III.

▮ Merritt also argues that the district court incorrectly found his property claim against Vincent and Mackey to be barred by qualified immunity. Qualified immunity protects government officials from liability for civil damages "insofar as their conduct

---

**3.** The conclusion of this court in *Piatt* that the requirement of predeprivation process applies to all deliberate or planned conduct, whether or not that conduct was authorized, reflects the understanding that for *Parratt* to govern, the conduct complained of must be both unauthorized *and* random. As the court explained, "[w]hile the [Supreme] Court in *Hudson* extend- ed *Parratt* to relatively minor infractions involving random and unauthorized but intentional conduct by state officials, it has refused to endorse the constitutionality of remedial process where the deprivation is not random or where it would have been practicable for the state to provide process before the fact." 773 F.2d at 1036 (citations omitted).

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), *quoted in Capoeman v. Reed*, 754 F.2d 1512, 1513–14 (9th Cir.1985). The district court erred in finding that qualified immunity protected Vincent and Mackey.

Vincent and Mackey are not entitled to qualified immunity protection because their conduct exceeded the scope of their authority and because they violated Merritt's clearly established constitutional rights. Vincent and Mackey testified that they knew they had no authority to require KADA to fire Merritt. Because they knowingly acted outside the scope of their authority, they are not entitled to qualified immunity.[4] However, even if we found that Vincent and Mackey acted within the course of their authority, they still would not be entitled to qualified immunity. It is clearly established that state law or an independent source may create a property right in employment protected by the Due Process Clause. *Board of Regents v. Roth*, 408 U.S. 564, 577–78, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Both KADA's personnel procedures and the relevant decisional law clearly established Merritt's property right in continued employment. When the law is clearly established, as here, the qualified immunity defense fails "since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738. Vincent and Mackey should have known that they could not cause Merritt's summary dismissal without violating his due process rights.

**IV.**

We review de novo the district court's grant of summary judgment in favor of the defendants on the plaintiff's claims alleging deprivation of a liberty interest and tortious interference with employment. *See Lojek v. Thomas*, 716 F.2d 675, 677 (9th Cir.1983). We affirm. An individual has a liberty interest in employment protected by the Due Process Clause if the dismissal is "for reasons that might seriously damage his standing in the community," *Bollow v. Federal Reserve Bank*, 650 F.2d 1093, 1100 (9th Cir.1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982), or if the dismissal effectively precludes future work in the individual's chosen profession, *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). The district court correctly found that, as a matter of law, Merritt's dismissal did not implicate a protected liberty interest because the stated reasons for his dismissal were not sufficiently serious to stigmatize him. *See Bollow*, 650 F.2d at 1101 (requisite level of severity evidenced by accusations of moral turpitude). The district court also correctly granted summary judgment on the second ground; Merritt presented no evidence to support his allegations that he was precluded from future counseling employment.

Merritt also alleged that the United States, pursuant to 28 U.S.C. § 1346(b), should be civilly liable for one of its officials who violated a state criminal statute that prohibits the use of force, threats, or intimidation to prevent any person from performing employment or accepting new work. Or.Rev.Stat. § 659.240(1). The statute does not create a private cause of action, and the district court correctly de-

---

**4.** In procedural due process claims under section 1983 there is an inherent tension in determining whether an agent's action is sufficiently "authorized" to bring the case under *Logan* rather than *Parratt* and yet sufficiently "unauthorized" to remove the cloak of qualified immunity. The tension, however, is more apparent than real. The distinction between *Logan* and *Parratt* focuses on whether injury is sufficiently predictable to make a predeprivation remedy practicable. Thus, when a state actor steps outside of his authority so as to deprive individuals of their rights in a way that is known or predictable, the state can practicably provide predeprivation protection from unauthorized conduct. As this court noted in *Piatt*, the "considerations underlying *Parratt* are simply inapplicable to deliberate, considered, planned, or prescribed conduct by state officials, *whether or not such conduct is authorized.*" 773 F.2d at 1036 (emphasis added). *See also Bretz v. Kelman*, 773 F.2d 1026 (9th Cir.1985) (because a conspiracy is not random, *Parratt* does not apply, even though the conduct may be unauthorized).

clined to find one. *See Burnette v. Wahl,* 284 Or. 705, 588 P.2d 1105, 1109–10 (1978).

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR A NEW TRIAL. The plaintiff may recover costs on appeal.

NORRIS, Circuit Judge, concurring:

I write separately even though I concur in Judge Ferguson's opinion. This case calls upon us once again to engage in the difficult line-drawing enterprise of deciding whether a given employment situation gives rise to a cognizable property right under the due process clauses of the Fifth and Fourteenth Amendments. I agree with the district court and with Judge Ferguson that Oregon law gave Merritt a constitutionally significant property interest in his continued employment. In my view, this conclusion follows not only from *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), but also *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), in which the Supreme Court recognized that a contractual interest in continued employment falls within the class of "property" interests that may be subject to procedural due process protections. *Id.* at 601, 92 S.Ct. at 2699. At heart, it is this Supreme Court precedent—liberating the definition of property from "rigid, technical forms," *id.* —with which Judge Wallace is really quarrelling in his dissent. Thus, while I share his concern that our jurisprudence not afford constitutional status to the entirety of state contract law, I believe that we cannot escape the Supreme Court's mandate explicit in *Roth* and *Perry* that state law can create a constitutionally significant property interest in an employment relationship.

WALLACE, Circuit Judge, dissenting:

I join only part IV, which affirms a portion of the district court judgment. I dissent from part II. I conclude that the majority incorrectly defines the interest which Merritt alleges is protected by the due process clauses, and applies *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (*Parratt* ), without proper regard for its meaning or for its interpretation in our subsequent cases. I also conclude that Merritt's due process claim does not allege the deprivation of a protected interest and that, in any case, post-deprivation remedies would afford him due process. I would therefore affirm the judgment on these grounds and would not reach the qualified immunity issue considered in part III of the majority opinion.

## I

To state a claim for relief under 28 U.S.C. § 1983 or under *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), a plaintiff must allege that a government actor deprived him of his constitutional rights. Merritt alleges that state and federal governmental employees deprived him of his right to due process under the fourteenth and fifth amendments. The right to due process is a right to procedural protection—usually notice and some kind of hearing—before the government deprives one of a protected property or liberty interest. Merritt's action thus hinges on the existence of such an interest.

### A.

The majority claims that Merritt had a protected property interest in his specific private employment. Maj. op. at [1369–1370]. It relies for this conclusion on two passages from the Supreme Court's opinion in *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (*Greene* ). The second of these passages tells us nothing regarding whether Merritt had a property interest in his specific private job. It merely states that parties "ha[ve] the right to be free from unauthorized actions of government officials which substantially impair [their] property rights." *Id.* at 493 n. 22, 79 S.Ct. at 1412 n. 22. It does not tell us when such property rights subject to impairment exist.

This leaves us with the first passage from *Greene* which states that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Id.* at 492, 79

S.Ct. at 1411. I would not dispute that proposition to the extent that, as the Supreme Court has subsequently made clear, a person's "right to follow a chosen trade or profession," though not his right to hold *a particular job*, represents a protected *liberty* interest. *See Cafeteria & Restaurant Workers Union, Local 437 v. McElroy*, 367 U.S. 886, 895–96, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961) (*Cafeteria Workers*). However, I cannot accept the quoted passage as authority for the different proposition put forth by the majority that with only a unilateral expectation of keeping his job, a person automatically has a protected property interest in retaining that job. The passage simply does not stand for this novel assertion. Nor do I see how the quotation of this passage in the other two cases cited by the majority, *Phillips v. Bureau of Prisons*, 591 F.2d 966, 970 (D.C.Cir.1979), and *United States v. Briggs*, 514 F.2d 794, 798 (5th Cir.1975), helps the majority's argument. In each case, the court quoted the passage from *Greene* in the context of a discussion of the effect that a governmental action could have on the plaintiff's ability to obtain employment at all or to follow a particular profession. Thus, the government's action had implicated a protected liberty interest. *See Cafeteria Workers*, 367 U.S. at 895–96, 81 S.Ct. at 1749. There is nothing in either case about a property interest in retaining a particular job. Thus, I disagree with the majority's argument in footnote I that this case is "on all fours" with *Greene.* The plaintiff in *Greene* had been deprived not only of the job he had, but of the security clearance necessary to pursue his career at all. *See Greene*, 360 U.S. at 475–76, 493, 79 S.Ct. at 1403, 1412. *Greene* therefore clearly involves a liberty interest, and cannot be "on all fours" with the case before us, where no such interest is implicated.

There are several reasons why I find the passage from *Greene* upon which the majority relies to determine that Merritt had a property interest in continued employment insufficient to support this proposition. First, the passage itself is dicta. It occurs in the midst of the discussion of contentions raised by the petitioner which the Court ultimately determined it need not address. *See id.* at 493, 79 S.Ct. at 1412. Nor, insofar as the passage relates to property interests rather than liberty interests, was it necessary to the resolution of the case. The issue in *Greene*, as the Court framed it, involved a "security clearance program under which affected persons may lose their jobs *and* may be restrained in following their chosen professions" without the benefit of adversarial hearing. *Id.* (emphasis added). The right to follow a certain profession is a liberty interest. *See Cafeteria Workers*, 367 U.S. at 895–96, 81 S.Ct. at 1749. *Greene* clearly was decided on the basis of the Court's determination that the government had interfered with a liberty interest, not with a property interest.

Even if the passage upon which the majority relies were not dicta, I cannot believe that the Supreme Court intended this passage to represent the broad and novel statement regarding the existence of a property interest in every individual job that the majority now asserts it does. "Property interests," the Supreme Court has reminded us, "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (*Roth*). But in the passage upon which the majority relies, the Supreme Court made no reference to any source of law outside the Constitution that could arguably have created a property right in an individual job. Instead, the Court merely cited a string of cases all of which, with the possible exception of *Slochower v. Board of Education*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956), dealt with governmental interference with an individual's freedom to follow a particular *profession* —something we know to be a constitutionally protected *liberty* interest. I suggest it is unreasonable to believe that the Court in *Greene* relied on some extra-constitutional source of law as the basis for the broad property interest that the majority finds in this case without so much as mentioning it. Thus, I am forced to conclude that the

Supreme Court meant no more in the passage in question than that, given the existence of a property interest in an individual job, unreasonable government interference with this interest offends the fifth amendment's guarantee of due process of law. But whether a property interest exists in the first place will have to be determined by a source of law independent of the Constitution. In this case, that source must apparently be state law. Therefore, we should next determine whether Oregon law gave Merritt a protected property interest in his individual job.

Whether state law gives Merritt a property interest is a more difficult issue, resolution of which must be guided by *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (*Paul*). In *Paul*, the Court held that the government had not deprived Paul of a property interest protected by the due process clause although government action had caused damage to Paul's reputation. *Id.* at 711–12, 96 S.Ct. at 1165. The Court distinguished *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (*Constantineau*), where government action had damaged a person's reputation and caused her to be barred from buying liquor. The Court observed that in both cases, the plaintiff had suffered damage to reputation, an interest protected by state tort law. Nevertheless, the Court held that this interest was not property under the due process clause. *Paul*, 424 U.S. at 711–12, 96 S.Ct. at 1165. Only in *Constantineau* did the government deprive the plaintiff of a right granted by the state—the right to buy liquor. *Id.* at 708–09, 96 S.Ct. at 1164. Therefore, only in the latter case was the plaintiff deprived of a protected interest. *Id.* at 711–12, 96 S.Ct. at 1165. Therefore, in order to determine whether Merritt has a protected property interest in his job, we must determine whether his continued enjoyment of that job is a right granted by the State of Oregon or merely an interest which Oregon's tort law protects.

The majority omits this essential determination and ignores the explicit teachings of *Paul*. Instead, it cites *Roth* for the proposition that "an employee may establish the existence of a property interest in contin-

ued employment by demonstrating a reasonable expectation based upon state law, rules or regulations concerning discharge or express or implied promise." Maj. op. at [1371]. There are two fundamental problems with this proposition, however. First, *Roth* nowhere asserts it. *Roth* merely states the proposition's inverse—that someone who had no basis in state law for an expectation of continued employment could not possibly have a property right in his continued employment. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. But it is a well known principle of logic that a statement need not be true merely because its inverse is true. Second, even if *Roth* did assert that the existence of any state law or rule "concerning discharge or express or implied promise" created a protected property right in continued employment, then it would appear that, insofar as this statement referred to an interest protected only by state tort law rather than to an actual right granted by the state, it has been overruled by *Paul*. Application of *Paul's* test to the Oregon law relating to Merritt's interest in his job is a step we cannot omit if we are to determine whether or not Merritt's interest is a protected property interest.

The district court held on the basis of *Yartzoff v. Democrat-Herald Publishing Co.*, 281 Or. 651, 576 P.2d 356 (1978) (*Yartzoff*), and *Kay v. North Lincoln Hospital District*, 555 F.Supp. 527, 529–30 (D.Or. 1982) (*Kay*), that the presence of a clause in Merritt's employment contract providing that he could be fired only for cause "gave him a property interest in continued employment." I disagree. *Yartzoff* merely held that summary judgment for the defendant in the plaintiff's wrongful discharge action was improper where a jury could reasonably infer that "just cause" termination provisions in the employer's policy handbook constituted part of the plaintiff's employment contract. There is nothing in the case about any state law right to continued employment; the case merely involves an unresolved factual issue in a simple tort action. *Yartzoff* properly stated that it is well-established under Oregon law that "in the absence of a contract

or statute to the contrary, an employer may discharge an employee at any time and for any cause." *Yartzoff*, 281 Or. at 654, 576 P.2d at 359. The plaintiff in *Yartzoff* pointed to no state statute extending to her "any legal guarantee of present enjoyment of [her continued employment]." Rather, the state had merely provided a tort law mechanism for protecting Yartzoff's interest in continued employment from injury. Thus, applying the test of *Paul* to the interest asserted in this case, it is clear that any injury to that interest "d[id] not result in a deprivation of any ... 'property' recognized by state or federal law." *Paul*, 424 U.S. at 712, 96 S.Ct. at 1166.

The court in *Kay*, in contrast, held explicitly that Oregon's law relating to "just cause" policies forming part of an employment contract create a "property interest" in continued employment. *Kay*, 555 F.Supp. at 529–30. In so doing, the court relied on *Roth* and *Yartzoff*, but, as shown above, neither case supports this conclusion. More importantly, *Kay* completely ignored the Supreme Court's *Paul* test, with its distinction between a right granted by the state and an interest protected only by state tort law. While I agree that Oregon's law relating to just cause policies as forming part of an employment contract impinge upon an employee's interest in continued employment, I can see no basis for holding that this interest is one created by a state granted right. Rather, it is merely an interest protected by state tort law. As such, under *Paul*, it is not a property interest.

Thus, because Merritt has shown no basis in state law for the conclusion that Oregon grants its citizens a *right* to continued employment, I conclude that Merritt's interest in retaining his position was merely one protected by state tort law and not a property right. I suggest that to hold Merritt's interest is "property" within the meaning of the due process clause is not only to ignore the Supreme Court's message in *Paul*, but to trivialize the Constitution.

**B.**

The majority cites our recent decision in *Castaneda v. United States Department of Agriculture*, 807 F.2d 1478 (9th Cir. 1987) (*Castaneda*), in which we pointed out that the Supreme Court in *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 789–90 n. 22, 100 S.Ct. 2467, 2477 n. 22, 65 L.Ed.2d 506 (1980) (*O'Bannon*), had left open the question of "the possibility that where the government indirectly yet intentionally injures or affects the legal status of a person by action taken directly against a private third party, the injured person can maintain a due process challenge against the government." *See Castaneda*, 807 F.2d at 1480 n. 4. This obviously is not precedent; the Court merely observed that the issue has not been decided. In dicta, *O'Bannon* did state that "if the Government were acting against one person for the purpose of punishing or restraining another, the indirectly affected individual might have a constitutional right to some sort of hearing." *O'Bannon*, 447 U.S. at 789–90 n. 22, 100 S.Ct. at 2477 n. 22. Whatever the precedential effect that this observation might have, it is of no relevance in the case before us.

The record does not reveal any evidence that the governmental agents acted for the "purpose of punishing or restraining" Merritt. The only evidence in the record shows that the agents' purpose was to assure that KADA complied with state and federal standards for outpatient alcohol treatment services. The open question, therefore, is not before us. It is interesting, however, that *O'Bannon* distinguished, in dicta, cases involving "the direct relationship between a public employer and its employees"—where protected property interests exist—from cases "concerning the right of an employee who loses his job as a result of government action directed against a third party." *O'Bannon*, 447 U.S. at 788–89 n. 21, 100 S.Ct. at 2477 n. 21. Merritt's case clearly falls into the latter group.

I would hold, therefore, that the right of noninterference with contracts is not an interest protected by the due process clauses. *See also Rutledge v. Arizona Board*

*of Regents,* 660 F.2d 1345, 1353 (9th Cir. 1981) (holding that a verbal assault, although tortious, does not deprive a plaintiff of a protected interest) (*Rutledge*), aff'd sub nom. *Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983); *cf. Corbitt v. Andersen,* 778 F.2d 1471, 1481 n. 3 (10th Cir.1985) (dicta) (Bohanon, J., dissenting) (doubting whether section 1983 provides a remedy for the tort of intentional interference with prospective contractual relation).

## II

Even if the governments' acts did implicate the due process clauses in this case, *Parratt* establishes that due process may be satisfied by a post-deprivation remedy. I first analyze whether post-deprivation remedies could be adequate in this case, and then consider whether any such remedies are in fact available here.

### A.

To determine whether post-deprivation remedies provide adequate process, we undertake two related inquiries. First, we consider the extent to which the government acknowledged, ratified, or promoted the act of deprivation. *Parratt* distinguishes action that is an "established state procedure" from action that is "unauthorized." 451 U.S. at 541, 101 S.Ct. at 1916. A post-deprivation remedy provides inadequate process for a governmental act prescribed by rule or regulation, but provides adequate process for an act that is completely unauthorized. Second, even if the act was unauthorized, post-deprivation remedies may be inadequate nonetheless if the government could have provided a "meaningful hearing before the deprivation took place." *See id.* We therefore should consider whether the government could have readily foreseen the deprivation and provided a timely hearing or, instead, whether the deprivation was "random" and of such a nature that the government could not "predict precisely when the loss w[ould] occur." *Id.* Although those two inquiries are closely related, considering each of them separately enhances clarity.

### 1.

The record does not indicate that interfering with a private employee's relationship with his employer was an established policy, practice, or custom of either the state or federal government. If anything, the record shows that this interference was unauthorized. The state and federal regulations that guide government employees in this situation imply that such interference was improper. Merritt argues that the conduct of both individual defendants was unauthorized and that the two were defying "express and clear limitations" on their authority. Indeed, the majority itself declares Mackey's and Vincent's action to be "contrary to official policy." Majority op. *supra* at 1372.

The majority observes that "Vincent's and Mackey's conduct occurred as part of an institutionalized practice of evaluating the recipients of government funding." Majority op. *supra* at 1372. This fact, however, is of no relevance to determining whether the challenged conduct was an established state practice. It is not the evaluation but the interference that is the basis of the action. Almost all government actions occur "as part of an institutionalized practice." In *Parratt,* for example, the challenged conduct was part of the institutionalized practice of delivering prisoners' mail. *Parratt,* 451 U.S. at 530, 100 S.Ct. at 1910. Nevertheless, losing a prisoner's mail—the challenged deprivation of property—was not an established state practice. *Id.* at 541, 101 S.Ct. at 1916. Similarly, in *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984) (*Hudson*), the Court found that destroying a prisoner's property while ransacking a prison cell was "unauthorized" although this destruction occurred as part of the established practice of searching for contraband in a government institution. Classifying conduct as arising in an institutional context does not make it any easier to determine whether the conduct was an established state practice or, instead, unauthorized.

The majority also observes that Mackey and Vincent had informed their immediate

supervisors about their recommendation that KADA terminate Merritt to comply with its government contracts. Majority op. at [1372]. This fact, however, does not render the government agents' actions an "established" government practice. An act does not become "authorized" by the government simply because a supervisor is aware of the act. *See, e.g., Parratt*, 451 U.S. at 530, 537 n. 3, 541, 101 S.Ct. at 1910, 1913 n. 3, 1916 (alleged actions of a prison warden and prison hobby manager did not constitute an established state practice); *Rutledge*, 660 F.2d at 1352 (actions of head football coach at a state university did not amount to an established state practice requiring predeprivation process). Nothing in the record indicates that Mackey's and Vincent's direct supervisors set policy, determined guidelines, or established practices of any kind. Indeed, the two supervisors apparently were bound by the same regulations and guidelines that governed Mackey and Vincent.

The majority opinion contains one other sentence relating to the question of authorization. The majority quotes language from our decision in *Piatt v. MacDougall*, 773 F.2d 1032, 1036 (9th Cir.1985) (en banc) (*Piatt*), that *Parratt* does not apply to "deliberate, considered, planned, or prescribed conduct ... whether or not such conduct is authorized." As quoted, this language implies that because Vincent's and Mackey's decision was "deliberate, considered, or planned," an inquiry into whether the practice was authorized is irrelevant. This proposition, however, is unsound. First, *Piatt's* holding is the far narrower proposition that alleging challenged conduct to be a "matter of consistent policy" is sufficient to withstand attack on *Parratt* grounds. 773 F.2d at 1034. As alleged, the conduct in *Piatt was authorized* by state policy, 773 F.2d at 1034; therefore, *Parratt* does not apply to the conduct, whether deliberate or not. The language quoted by the majority is thus clearly dicta. Even more importantly, the dicta in *Piatt* is directly contrary to the Supreme Court's holding in *Hudson*, 468 U.S. at 533, 104 S.Ct. at 3203 (holding that *Parratt* does apply to intentional conduct if the conduct

is unauthorized). We should follow the Supreme Court.

2.

The second inquiry for determining if post-deprivation remedies provide adequate process—whether the conduct was predictable or random—is addressed by the majority in only cursory fashion. The majority states that because Vincent and Mackey had consulted with their supervisors "[i]t would therefore have been practicable for the state and federal authorities to have afforded Merritt some predeprivation process." Majority op. *supra* at 1372. If the majority means by this that, because the two supervisors could have predicted the injury, the two governments also could have predicted it, then the majority plainly conflicts with *Parratt*. "Whether an individual employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is solely whether the state is in a position to provide for predeprivation process." *Hudson*, 468 U.S. at 534, 104 S.Ct. at 3204. That is, the controlling inquiry is whether the deprivation could have been predicted by what the majority labels "the state administrative machinery." Majority op. *supra* at 1371.

The majority is wrong, I suggest, in failing to appreciate that a single supervisor at the lowest level in the bureaucratic hierarchy does not constitute this "administrative machinery." Nothing in the record indicates that Mackey, Vincent, or either of their immediate supervisors held positions permitting them to set policy or determine when hearings should or should not be provided. In fact, the "administrative machinery" for both the state and federal government had promulgated administrative procedures to guide the conduct of the agents responsible for overseeing contractors such as KADA. *See, e.g.*, 41 U.S.C. §§ 401–420, 601–613; 41 C.F.R. §§ 1 *et seq.* (1983); Or.Rev.Stat. §§ 279.011–279.990 (1983); Or.Admin.R. §§ 127–40–010 to 127–40–090 (1983). No one contends that the job descriptions of the two supervisors included the authority to modify or extend those regulations.

If, instead, the majority has some other individuals in mind when it refers to the

"state and federal authorities" who should have afforded Merritt process, the majority does not identify these authorities by name or description. Furthermore, the record does not indicate—nor does Merritt contend—that any such "authorities" were aware of Vincent's and Mackey's conduct.

The majority addresses the question of whether the government actors' conduct was "random" solely by way of conclusion. We are told, twice, that "Mackey and Vincent's conduct was not random" but we are never told why. Majority op. *supra* at 1372. The record does not indicate that Mackey and Vincent's conduct was a continuing problem, or one that past experience had shown was likely to recur. In fact, the record indicates that this incident was unique: "[i]t never came up before."

Furthermore, I find no evidence in the record that this unique occurrence was the sort of situation either government could have predicted in advance. They had no contractual or regulatory relationship with Merritt. How could the state or federal government predict that they might need a set of procedures to guide their employees when dealing with parties who had no dealings with the government? Merritt's real complaint may be that his employer did not avail itself of the existing procedural protections. Merritt has no standing, however, to raise his employer's rights. The majority simply fails to point to any evidence supporting its assertion that this incident was "not random."

I conclude, therefore, that post-deprivation remedies, if available, provide due process in this case because the conduct of the governmental agents was neither an established state practice nor predictable even though unauthorized.

### B.

The final issue, which the majority does not reach, is whether post-deprivation remedies are in fact available to Merritt. As regards Vincent, the state employee, a state tort action alleging intentional interference with a contractual relationship was available and was, in fact, pleaded. A post-deprivation remedy was thus clearly available.

Whether adequate remedies are available against Mackey, the federal employee, or against the United States is more problematic. Merritt could have brought the same state tort claim against Mackey that he brought against Vincent. Therefore, Merritt did have some post-deprivation remedy against Mackey. This remedy, however, is provided by a different sovereign, Oregon. Assuming a state tort remedy could satisfy federal due process, it seems unlikely that Merritt could bring a state law tort claim against the United States. The Federal Tort Claims Act excludes from its waiver of sovereign immunity actions for intentional interference with contract. *See* 28 U.S.C. § 2680(h). The parties did not adequately address, either in the district court or on appeal, the issue of a federal post-deprivation remedy. I would therefore remand this issue for further proceedings, were it critical to our decision.

### III

The governments did not deprive Merritt of an interest protected by the due process clauses. I would therefore affirm the judgment of the district court. Moreover, post-deprivation remedies would provide due process and were available, at least with respect to the state employee.