**Ronald G. POWELL, Plaintiff,**

v.

**Dave COOK, Ben De Haan, Nick Armenakis, S. Frank Thompson, Steve Shelton, B.J. Shepard, John Vargo, David Degner, A. Santos, Nick Meier, William Cahal, Michael Puerini, Rebecca Bay, Joan Robak, Steve Lickar, and D. Scott, Defendants.**

Civil No. 98–1079–FR.

United States District Court, D. Oregon.

Nov. 8, 1999.

Ronald G. Powell, Portland, OR, pro se.

Hardy Myer, Atty. Gen., Jan Peter Londahl, Asst. Atty. Gen., Dept. of Justice, Salem, OR, for Defendants.

## OPINION

FRYE, District Judge.

The plaintiff, Ronald G. Powell, an inmate at the Santiam Correctional Institution (SCI), brings this action pursuant to 42 U.S.C. § 1983 *pro se*. Currently before the court is the defendants' motion for summary judgment (# 26). Plaintiff Powell was advised of federal summary judg-

ment standards by order of this court on February 11, 1999. For the reasons set forth below, the defendants' motion is granted, and this action is dismissed.

## SUMMARY OF CLAIMS

Plaintiff Powell alleges in his amended complaint that the defendants violated his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Plaintiff Powell's claims center around the alleged failure of defendants Thompson, Shepard, Dr. Vargo, and Dr. Degner to assign him to a lower bunk because of his medical conditions, and the medical care that he received after he suffered a fall on December 3, 1996.

Plaintiff Powell alleges that while he was at the Oregon State Penitentiary (OSP) he was denied adequate medical care when defendants (1) did not immediately x-ray him following his fall; (2) diagnosed him as suffering from arthritis instead of some other condition; (3) delayed or denied him the medical attention and physical examinations that his symptoms called for; and (4) denied him lower bunk status.

Plaintiff Powell alleges that while he was at SCI he was denied adequate medical care when defendants (1) cleared him for work with the outside crew, thereby placing him "at great risk of further injury"; (2) failed to respond to his complaints that his condition was getting worse; (3) inadequately performed surgery; (4) refused to follow his surgeon's orders; (5) again cleared him for work with the outside crew, even though plaintiff Powell told them that his injuries were extremely painful; (6) refused to provide plaintiff Powell with medication; and (7) refused to send plaintiff Powell to a specialist outside of OSP.

## SUMMARY OF FACTS

Plaintiff Powell was in a motor vehicle accident prior to his incarceration. As a result of that accident, plaintiff Powell suffers from chronic pain in his lower back and pain in his ankle.

Plaintiff Powell arrived at OSP on August 25, 1996. Because he had no medical restrictions in his file, he was assigned the next available bed-space, # D-339A, which was an upper bunk on an upper tier. Plaintiff Powell was assigned to # D-339A until April 18, 1997, at which time he was transferred to the Columbia River Correctional Institution (CRCI). While he was housed at OSP, plaintiff Powell neither requested a change of cell from the Group Living Correctional Officer, defendant Shepard, nor did defendant Shepard ever receive a medical restriction for plaintiff Powell so he could be transferred to a lower bunk. According to defendant Shepard, if plaintiff Powell had received a medical restriction during his incarceration at OSP, he would have been reassigned to a lower bunk.

Plaintiff Powell was examined by defendant Dr. Degner at OSP on September 16, 1996 for complaints of back and ankle pain. Dr. Degner's diagnosis was that plaintiff Powell suffered from lower back pain and degenerative arthritis. Dr. Degner ordered plaintiff Powell not to participate in gym or weight lifting activities. He further ordered that plaintiff Powell be placed on light duty with no standing for longer than fifteen minutes at a time. Dr. Degner also ordered that plaintiff Powell not bend or lift any weight greater than 25 pounds. Plaintiff Powell declined a prescription for a nonsteroidal anti-inflammatory drug.

On January 9, 1997, Dr. Degner again examined plaintiff Powell, this time for complaints of pain resulting from plaintiff Powell's fall on December 3, 1996 from the upper bunk. Specifically, plaintiff Powell complained of pain in his left chest and a persistent sharp pain that radiated down his left arm. Plaintiff Powell exhibited a good range of motion in his neck and other body extremities, with no pain to palpatation. Dr. Degner noted that there was tenderness in plaintiff Powell's left 2nd and 3rd costochrondral joints, which he describes as the ligaments connecting the

rib to the sternum. Dr. Degner instructed plaintiff Powell to perform range of motion exercises and prescribed Orudis, an over-the-counter pain medication, and rest for plaintiff Powell.

Plaintiff Powell returned to see Dr. Degner on February 13, 1997, complaining of persistent problems with his left shoulder area and occasional numbness in his left arm. Dr. Degner's examination of plaintiff Powell revealed that his left trapezeus was tender, and that he had a good range of motion with no pain upon palpatation of the neck. Dr. Degner found that plaintiff Powell's left rhcombroid muscles were also tender. Because plaintiff Powell told him that the previously prescribed Orudis had helped, Dr. Degner re-prescribed Orudis for another month. Dr. Degner ordered a cervical spine series of x-rays and ordered plaintiff Powell to return in one month.

On February 19, 1997, plaintiff Powell received a cervical spine x-ray. The x-ray revealed that plaintiff Powell had cervical spondylosis, commonly known as mild degenerative arthritis, in his neck.

On March 10, 1997, Dr. Degner examined plaintiff Powell and reviewed the x-rays. Dr. Degner was of the opinion that plaintiff Powell's degenerative arthritis should be treated with a nonsteroidal anti-inflammatory medication, and that surgical intervention was not necessary. Dr. Degner told plaintiff Powell to stop using the Orudis and instead to take the drug, Relafen, for three months. In response to plaintiff Powell's complaint of weakness in his left hand, Dr. Degner ordered a nerve conduction study.

The nerve conduction study was performed on April 30, 1997. However, because plaintiff Powell was transferred to CRCI on April 17, 1997, he never saw Dr. Degner again. Although Dr. Degner had never reviewed the results of the nerve conduction study with plaintiff Powell, Dr. Degner notes that the study suggests a mild wrist entrapment neuropathy, similar to carpal tunnel, or a possible irritant at the C8–T1 nerve root level. Dr. Degner suggested that plaintiff Powell's condition is best treated conservatively over a period of time. Dr. Degner states that plaintiff Powell never requested a lower bunk restriction, and that a lower bunk assignment was medically necessary for plaintiff Powell.

Plaintiff Powell was transferred from CRCI to SCI on April 25, 1997. On May 19, 1997, Dr. Puerini examined plaintiff Powell, who complained of left shoulder pain that had originated from a knot in his left trapezius muscle and traveled to his left arm and shoulder. Dr. Puerini noted that plaintiff Powell's shoulder was "grossly normal," and that plaintiff Powell's neck movements were normal. He also noted that there was no atrophy, and that sensation was evident throughout. Dr. Puerini's diagnosis was that plaintiff Powell suffered from a chronic or sub-acute neck strain secondary to trauma. Dr. Puerini further determined that there was no evidence of a pinched nerve. Dr. Puerini instructed plaintiff Powell to undertake physical therapy; recommended that plaintiff Powell be assigned to a lower bunk; discontinued the drug, Relafen, which had previously been prescribed by Dr. Degner; and prescribed Feldene, an anti-inflammatory muscle relaxant.

On June 10, 1997, plaintiff Powell returned to see Dr. Puerini complaining of ongoing left arm numbness, although plaintiff Powell stated that the numbness he suffered was less frequent and the pain was gone. Dr. Puerini examined plaintiff Powell's neck again and found no evidence of nerve damage. Dr. Puerini discussed the results of the nerve conduction studies that were done prior to plaintiff Powell's transfer. During this visit, plaintiff Powell also complained of nasal discharge. Dr. Puerini determined that plaintiff Powell had sinusitis and prescribed the drug, Sudafed.

Plaintiff Powell returned to Dr. Puerini's office on June 25, 1997 complaining of ailments unrelated to his prior visit. During this examination, plaintiff Powell did not complain of pain in his left arm.

Plaintiff Powell saw Dr. Puerini again on August 1, 1997 complaining of other non-related ailments. He stated that his shoulder symptoms were not any better. Dr. Puerini prescribed medications for the other ailments and ordered an MRI and orthopedic consultation based on plaintiff Powell's complaints of ongoing neck pain. Following the referral for an orthopedic consultation, Dr. Puerini saw plaintiff Powell on two more occasions, once on August 7, 1997 and once on August 14, 1997, for unrelated ailments.

As a result of Dr. Puerini's referral, plaintiff Powell was examined by Dr. Becker, an orthopedic specialist, on September 9, 1997. Upon examination of plaintiff Powell, a review of his medical chart, a review of the results of the nerve conduction velocity test performed on April 30, 1997, and a review of the MRI performed on August 20, 1997, Dr. Becker concluded that plaintiff Powell suffered from no serious medical conditions. Dr. Becker recommended that plaintiff Powell exercise to loosen up the muscles in his collar bone area; continued the prescription of Feldene; and asked that plaintiff Powell return in two months unless his symptoms worsened or changed in character.

Dr. Becker examined plaintiff Powell again on September 16, 1997 based on his complaints of non-localized, occasional numbness in his extremities. Plaintiff Powell also complained that he was unable to sleep. Dr. Becker determined that plaintiff Powell had a contusion sprain of the cervical dorsal spine and cervical spondylosis.

On September 26, 1997, plaintiff Powell reported that he was experiencing cervical dorsal pain in his spine, plus pain in his lower back and shoulder. Dr. Puerini renewed the pain medication for plaintiff Powell and scheduled another appointment with Dr. Becker.

On October 23, 1997, Dr. Becker determined that plaintiff Powell had thoracic outlet syndrome.[1] Plaintiff Powell was referred to Dr. Geiser, an orthopedic surgeon. Dr. Becker and Dr. Geiser conferred on November 4, 1997, and concluded that thoracic outlet surgery at the first rib resection was necessary.

Dr. Puerini reviewed plaintiff Powell's progress on October 30, 1997. Dr. Puerini found no atrophy, mild but diffused lessening of distal strength, and no clear focal findings, in response to plaintiff Powell's complaints of intermediate symptoms of medical arm numbness.

Plaintiff Powell saw Dr. Puerini on November 5, 1997, complaining that the pain medication was not working. Dr. Puerini prescribed Amitriptilene, a medication commonly used for neuropathic pain.

Plaintiff Powell saw Dr. Puerini on November 25, 1997 because of a cough and a fever. Dr. Puerini diagnosed bronchitis as the problem and canceled the thoracic outlet surgery that was scheduled for that same date.

Dr. Puerini examined plaintiff Powell on December 1, 1997, and noted that the bronchitis was improved. During this examination, plaintiff Powell expressed a desire to postpone the thoracic outlet surgery which had been rescheduled for the following week. Plaintiff Powell wished to postpone surgery because of his upcoming parole date. Dr. Puerini examined plaintiff Powell on December 5, 1997. This examination revealed that plaintiff Powell had a good range of motion, although he

1. Thoracic outlet syndrome is a genetic condition where the passage way for the blood vessels traveling from the chest cage, over the first rib (T–1), and behind the collar bone into each arm is narrowed. The narrow opening causes numbness in the arm or tingling in the hand by putting pressure on the blood vessels, which in turn causes fluid to buildup in the arm. This fluid buildup causes the patient to experience arm numbness, symptoms of ulnar nerve numbness or carpal tunnel syndrome. Not everyone who experiences neck and shoulder pain or arm numbness has thoracic outlet syndrome. Treatment for thoracic outlet syndrome includes exercises and non-steroidal anti-inflammatory drugs which help the patient relax. Surgery is not necessary in every case.

was guarding his left arm mobility. In examining plaintiff Powell's ribs, Dr. Puerini could not find any deformities.

Plaintiff Powell had thoracic outlet surgery on December 12, 1997 at Salem General Hospital and was discharged back to SCI on December 14, 1997.

Dr. Puerini examined plaintiff Powell on December 16, 1997 upon his complaints of pain following the surgery. Dr. Puerini prescribed the drug, Vicodin. On December 18, 1997, Dr. Puerini examined plaintiff Powell. He concluded that the would was healing well, and that plaintiff Powell's range of motion showed that his shoulder was healing well. Dr. Geiser informed Dr. Puerini that plaintiff Powell would need pain medication for about 10 days following surgery. Plaintiff Powell requested narcotic pain relievers on January 8, 1998, 27 days after surgery. Dr. Puerini prescribed a non-narcotic pain reliever based on Dr. Geiser's advice that the narcotic was only needed for about 10 days following surgery.

Dr. Bay examined plaintiff Powell on February 18, 1998, who complained that he had numbness in his left arm, and that the Ibuprofen he was taking for pain was upsetting his stomach. Dr. Bay referred plaintiff Powell to Dr. Geiser for a follow-up examination.

Dr. Bay examined plaintiff Powell on March 23, 1998, who complained of pain in his left arm. Dr. Bay scheduled a follow-up examination with Dr. Geiser. On April 1, 1998, Dr. Bay determined that Dr. Geiser had retired. Dr. Bay scheduled an appointment for plaintiff Powell with Dr. Becker.

Plaintiff Powell was apparently in a second car accident on April 21, 1998, at which time he was examined by Dr. Bay. Dr. Bay noted that his range of movement was good. Plaintiff Powell stated that the drug, Motrin, that he had been given was helping for pain.

Plaintiff Powell saw Dr. Becker on May 18, 1998, complaining of chronic low back pain. Dr. Becker determined that plaintiff Powell had a lumbar sprain and ordered x-rays. No medical restrictions were ordered at this time. The x-rays, taken May 19, 1998, showed a satisfactory alignment of plaintiff Powell's spine, with a slight disc narrowing at the L5–S1 level. Dr. Becker further noted that there was no evidence of a fracture or dislocation.

On June 8, 1998, plaintiff Powell again saw Dr. Bay, complaining of pain in his left arm "so bad that he had not slept in four days." Plaintiff Powell stated that he had been ordered by Dr. Becker to see a doctor at the Oregon Health Sciences University (OHSU). Dr. Bay noted that Dr. Becker had made no such order. The following day Dr. Bay referred plaintiff Powell to Dr. Becker to assess plaintiff Powell's need to be sent to OHSU, his need for an EMG, his need for work restrictions, and his need for pain treatment.

On June 11, 1998, Dr. Becker saw plaintiff Powell. Plaintiff Powell complained of intermittent shooting pain in his left arm and an ache in his shoulder blades with certain moves above shoulder level. Dr. Becker determined that plaintiff Powell had a full range of motion in both his shoulder and neck. Dr. Becker prescribed work that allowed plaintiff Powell to keep his arms below shoulder level for six months; prescribed the drug, Feldene; and ordered that plaintiff Powell be assigned to a lower bunk for six months.

Dr. Becker examined plaintiff Powell again on June 30, 1998 as a follow up to the thoracic outlet surgery. Plaintiff Powell stated that there were no changes in his condition since the examination on June 11, 1998. Dr. Becker found that plaintiff Powell had a fair range of motion in his lower back with no spasms. A neurological examination was negative.

On October 21, 1998, plaintiff Powell arrived at "sick call" complaining of left shoulder and arm pain. Dr. Bay again referred him to Dr. Becker.

Dr. Becker last saw plaintiff Powell on November 17, 1998, at which time plaintiff Powell stated that he still experienced

numbness if he placed his arm in the "right position." Dr. Becker found no swelling, radiculopathy, and no neck symptoms. A physical exam of the neck (Spurling test) was negative, and the neurological exam was intact. Plaintiff Powell's ADSON test (lifting of the arm) of pulse was normal up to 120 degrees abduction.

Dr. Bay examined plaintiff Powell on March 9, 1999, complaining of low back pain. Dr. Bay found that plaintiff Powell had no difficulty bending; that he demonstrated a full range of motion; and that he was able to walk heel to toe without difficulty. Dr. Bay found that there were no objective findings for his complaints and referred him to Dr. Becker.

Dr. Becker states that plaintiff Powell's thoracic outlet syndrome was not caused by the fall, as plaintiff Powell alleges. Dr. Becker further states that plaintiff Powell's thoracic outlet syndrome was not disabling enough to require plaintiff Powell to be assigned to a lower bunk or to prevent him from being placed on a work crew.

## STANDARDS

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case. *Id.* When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. The evidence is to be viewed in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine issue for trial exists, however, where the record as a whole could not lead the trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## DISCUSSION

I. *Personal Involvement*

"Liability under section 1983 arises only upon a showing of personal participation by the defendant" in the alleged constitutional deprivation. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989); *Arnold v. Int'l Bus. Machs. Corp.,* 637 F.2d 1350, 1355 (9th Cir.1981). Liability may also be imposed if the defendant sets into " 'motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.' " *Gini v. Las Vegas Metro. Police Dep't,* 40 F.3d 1041, 1044 (9th Cir. 1994) (quoting *Merritt v. Mackey,* 827 F.2d 1368, 1371 (9th Cir.1987)).

" 'A supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.' " *Redman v. County of San Diego,* 942 F.2d 1435, 1446 (9th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992) (quoting *Thompkins v. Belt,* 828 F.2d 298, 303–04 (5th Cir.1987)); *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991); *Taylor,* 880 F.2d at 1045. There is no respondeat superior liability under section 1983. *Monell v. Dep't of Social Servs. of City of New York,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rise v. State of Oregon,* 59 F.3d

1556, 1563 (9th Cir.1995), *cert. denied* 517 U.S. 1160, 116 S.Ct. 1554, 134 L.Ed.2d 656 (1996); *Taylor,* 880 F.2d at 1045.

Plaintiff Powell has failed to show any personal involvement, other than involvement under a *respondeat superior* theory of liability, on the part of defendants Cook, de Haan, Armenakis, Thompson, Shelton, Santos, Meier, and Cahal, in the alleged violation of his constitutional rights. Accordingly, plaintiff Powell cannot prevail on his section 1983 claims for damages against these defendants.

II. *Deliberate Indifference to Serious Medical Needs*

Deliberate indifference to serious medical needs presents a cognizable claim for violation of the Eighth Amendment proscription against cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir.1992), *overruled on other grnds by WMX Techs., Inc. v. Miller,* 104 F.3d 1133 (9th Cir.1997); *Jones v. Johnson,* 781 F.2d 769, 771 (9th Cir.1986). A determination of "deliberate indifference" requires an examination of two elements: (1) the seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to those needs. *McGuckin,* 974 F.2d at 1059.

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* (citing *Estelle v. Gamble,* 429 U.S. at 104, 97 S.Ct. 285). Examples of instances where a prisoner has a "serious" need for medical treatment include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *Id.* at 1059–60 (citing *Wood v. Housewright,* 900 F.2d 1332, 1337–41 (9th Cir.1990)); *Hunt v. Dental Dep't,* 865 F.2d 198, 200–01 (9th Cir.1989).

There are certain minimum requirements before deliberate indifference can be established. First, there must be a purposeful act or failure to act on the part of the defendant. *McGuckin,* 974 F.2d at 1060. A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established. *Id.* Second, a prisoner can make no claim for deliberate medical indifference unless the denial was harmful. *Id.; Shapley v. Nevada Bd. of State Prison Comm'rs,* 766 F.2d 404, 407 (9th Cir.1985).

Plaintiff Powell has failed to show that the defendants purposefully ignored or failed to respond to his various complaints. In fact, the evidence presented by the defendants shows the contrary—that plaintiff Powell received prompt, extensive medical treatment for his medical complaints, and that plaintiff Powell also received timely examinations, medications, and instructions on how to stretch his sore muscles, as the defendants tried to determine the source of plaintiff Powell's ongoing pain. Although plaintiff Powell alleges that the medical treatment he received was improper, he did not produce any evidence contradicting the defendants' showing that he received adequate medical assistance. *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989) (conclusory allegations unsupported by factual data are insufficient to defeat a summary judgment motion).

Plaintiff Powell appears to have a difference of opinion as to what the appropriate course of treatment and medical restrictions was. However, a difference of opinion over proper medical treatment does not constitute deliberate indifference. *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir.1989). At most, plaintiff Powell *might* be able to make an argument that the failures of the various defendants to adequately diagnose and remedy his numerous ailments resulted from negligence on the part of someone, whether it be an individual or a group of individuals in-

volved in providing medical care to him. A complaint of negligence or medical malpractice, however, does not rise to the level of a constitutional violation. *See Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. 285. Accordingly, plaintiff Powell is not entitled to relief on his Eighth Amendment claims.

### CONCLUSION

The defendants' motion for summary judgment (# 26) is granted, and this action is dismissed with prejudice.

### JUDGMENT

Based on the record,

IT IS ORDERED AND ADJUDGED that this action is dismissed with prejudice.