[No. 18320–6–I.   Division One.   March 7, 1988.]

ROBERT E. SLAUGHTER, ET AL, *Appellants,* v. SNOHOMISH COUNTY FIRE PROTECTION DISTRICT NO. 20, ET AL, *Respondents.*

*John David Terry* and *Williams & Terry,* for appellants.

*Steven A. Branom* and *Clark Snure,* for respondents.

PEKELIS, J.—Robert E. Slaughter and Delores Ruth Slaughter appeal from a judgment dismissing their suit for unlawful discharge and sex discrimination.

I

Snohomish County Fire Protection District 20 is located in a rural area north of Marysville and west of Arlington. The District is staffed almost entirely by volunteers, under the direction of three commissioners.

Beginning in 1967, Robert Slaughter served as a volunteer fire fighter for District 20. In 1980, the commissioners appointed Slaughter volunteer chief, a position which he held until May 1983. In addition to his volunteer position, Slaughter was employed from 1972 until June 1983 as the District's only paid fire fighter. As such, he was responsible for maintaining the District's buildings and equipment.

Ruth Slaughter, Robert Slaughter's wife, was employed by the District as secretary to the commissioners. In this capacity, she was responsible for, among other things, keeping the District's records. In addition, she served as a volunteer fire fighter. At some point during her husband's tenure as volunteer chief, he appointed her volunteer captain of the Loma Lake Fire Station.

According to trial testimony, there was widespread unhappiness among the volunteer fire fighters during Robert Slaughter's tenure as chief. Many were concerned about perceived problems of leadership, morale, and cleanliness, as well as the District's overall state of readiness. Some of these concerns were presented to Robert Slaughter in December 1981, but no significant improvements were made.

By the spring of 1983, dissatisfaction with Slaughter's performance had spilled over into the community. At a commissioners' meeting on April 13, 1983, Slaughter agreed to resign as chief. The three commissioners agreed to resign as well, in order to allow for an entirely new administration. On May 1, however, Slaughter informed the commissioners that he would not resign. At their next meeting on May 18, the commissioners voted to discharge Robert Slaughter from his position as volunteer chief. At the same meeting, Ruth Slaughter resigned her position as secretary to the commissioners. The next day, Ruth Slaughter was asked to resign as volunteer captain, which she did.

Robert Slaughter returned to work from a vacation on June 1, 1983. At that time, Acting Chief William Overby told him that "his services [as paid fire fighter] were no longer required." Although the commissioners had given Overby broad authority to do "whatever was necessary" to revitalize the District, Overby doubted that he had authority to discharge Slaughter. Consequently, Overby contacted one of the commissioners, who prepared a letter informing Slaughter of his discharge for "failure to perform the duties, which includes [*sic*] maintenance of equipment, that are required by this department." The letter, which was signed on June 1, 1983, by two of the three commissioners, also instructed Slaughter to submit any claims for compensation to the District.

On June 8, 1983, Robert Slaughter, through his counsel, wrote to the commissioners requesting (1) a hearing to contest his discharge, (2) an accounting of all hours, wages, and benefits owed him, and (3) "any and all minutes, memoranda, or other documents which the Commission used . . . prior to making the termination decision." Counsel for the commissioners responded on June 14, asking that Slaughter's request for records be more specific and indicating that an accounting was in progress. On June 28, Slaughter was provided with a copy of the minutes of the May 18 meeting and was informed that a hearing would take place at the next commissioners' meeting on July 13.

The parties apparently approached the July 13 meeting with different expectations. The commissioners had in mind an opportunity for Slaughter, his counsel, and members of the community to speak in favor of or in opposition to Slaughter's discharge. Slaughter's counsel, on the other hand, indicated that he wished to examine Acting Chief Overby under oath. The commissioners went into executive session, after which they reconvened the meeting and announced that they did not have the authority to administer sworn oaths. Slaughter evidently found this unacceptable, because he left without making any presentation. The parties differ as to whether or not the commissioners were asked to specify the "charges" against Slaughter.

Robert and Ruth Slaughter thereafter brought suit against the District and the commissioners. After a bench trial, the court entered judgment in favor of the defendants.

## II

Robert Slaughter contends that he was never lawfully discharged from his position as paid fire fighter. He argues (1) that he could only be discharged for good cause and was therefore entitled to a pretermination "due process" hearing, (2) that the commissioners could not lawfully discharge him except at a public meeting, (3) that the commissioners could not delegate to Acting Chief Overby the authority to discharge him, and (4) that the commissioners took no action to discharge him at the July 13 meeting.

## A

Slaughter argues, first, that he could only be discharged for good cause and that because of this he was entitled to a pretermination "due process" hearing. The trial court rejected the argument, concluding that Slaughter's employment was terminable at will and that he was not entitled to a hearing.

In general, an employment contract indefinite as to duration is terminable at will by either the employer or the

employee. *Thompson v. St. Regis Paper Co.,* 102 Wn.2d 219, 223, 685 P.2d 1081 (1984). However,

> if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises *of specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship.

*Thompson,* 102 Wn.2d at 230. For example, promises found in an employee manual issued by an employer to its employees may, in appropriate situations, obligate the employer to act in accord with those promises. *Thompson,* 102 Wn.2d at 233. However, it must be shown that the employee justifiably relied on the employer's promises. *Thompson,* 102 Wn.2d at 230.

Slaughter's contention that he was entitled to a "due process" hearing depends entirely upon the proposition that he could only be discharged for good cause. As evidence of a "good cause" component in his employment relationship, Slaughter relies on the volunteer fire chief's job description. This document provides that one of the chief's duties shall be to "[p]romote, suspend, demote or discharge for due cause." However, this provision can hardly be said to be a *promise to the employee.* Moreover, there is no evidence that this document was ever issued to the District's employees, and no evidence that Slaughter relied upon it. Consequently, since he has failed to establish the existence of a "good cause" component in his employment relationship, Slaughter has failed to show that his employment was anything other than at will.

B

Next, Slaughter argues that the trial court erred in concluding that he was lawfully discharged on June 1, 1983, when the commissioners signed the letter of dismissal. He does not question the commissioners' authority to discharge him; rather, he argues that they could only do so at a meeting open to the public.

RCW 42.30.060 provides:

> No governing body of a public agency shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a meeting open to the public and then only at a meeting, the date of which is fixed by law or rule, or at a meeting of which notice has been given according to the provisions of this chapter. Any action taken at meetings failing to comply with the provisions of this section shall be null and void.

Slaughter would interpret the second sentence of RCW 42.30.060 as providing that any action taken by the commissioners outside a public meeting is null and void. However, that sentence is clearly addressed to actions taken at meetings which do not conform to the requirements of RCW 42.30. It is the first sentence of RCW 42.30.060 which states which actions must be taken at meetings open to the public.

The issue for our determination, then, is whether the commissioners' decision to discharge Robert Slaughter was an "ordinance, resolution, rule, regulation, order, or directive" within the meaning of RCW 42.30.060. We note, first, that the terms at issue are left undefined in RCW 42.30. *See* RCW 42.30.020. That being the case, we may look for guidance to statutes dealing with the same subject matter. *See Department of Transp. v. State Employees' Ins. Bd.*, 97 Wn.2d 454, 458, 645 P.2d 1076 (1982). The administrative procedure act, RCW 34.04, defines a "rule" as "any agency order, directive, or regulation *of general applicability* . . ." (Italics ours.) RCW 34.04.010(2). Similarly, we think, that the terms used in RCW 42.30.060 denote matters of some broad public import or "general applicability". We agree with the trial court that it would be unreasonable to expect that every public agency should hold a public meeting each time it must determine whether to hire or discharge an employee. *See, e.g., Puyallup v. Pacific Northwest Bell Tel. Co.*, 98 Wn.2d 443, 450, 656 P.2d 1035 (1982) (statutory interpretation which would lead to unreasonable and illogical consequence should be avoided).

We hold, therefore, that the decision to discharge Robert Slaughter was not an "ordinance, resolution, rule, regulation, order, or directive" within the meaning of RCW 42.30.060. It follows that Slaughter was lawfully discharged on June 1, 1983, when the commissioners signed the letter of dismissal. Having so concluded, we find it unnecessary to consider whether Acting Chief Overby had authority to discharge Slaughter earlier the same day or whether the commissioners effectively discharged Slaughter at the July 13 meeting.

## III

The rest of the appellants' claimed errors involve allegations which the evidence produced at trial simply fails to substantiate. First, Robert Slaughter claims that between 1972 and 1983 he worked 5,000 hours for which he was never paid. Since he presented no documentation or other evidence to substantiate this claim, the trial court correctly concluded that he had failed in his proof. Next, Slaughter claims that he is entitled to payment for accrued compensation time.[1] This contention is without merit. Neither the complaint nor the Slaughters' trial brief makes reference to compensation time. The evidence produced at trial to show that Slaughter had accrued some compensation time was incomplete, and there was no evidence, argument, or citation of authority to show that upon discharge payment for accrued compensation time was required, either as a matter of law or of district policy. The trial judge never addressed the issue in his oral decision or his findings and conclusions, and the appellants never objected below to this alleged omission.

Robert Slaughter also contends that the District negligently deprived him of retirement benefits under the Washington Law Enforcement Officers' and Fire Fighters'

---

[1]Slaughter also contends that he is entitled to payment for accrued vacation time. Since he provides no argument in his brief to support this contention, we decline to consider it. *See* RAP 10.3(a)(5); *Vern Sims Ford, Inc. v. Hagel,* 42 Wn. App. 675, 683, 713 P.2d 736, *review denied,* 105 Wn.2d 1016 (1986).

Retirement System (LEOFF II). However, the evidence produced at trial was insufficient even to establish that Slaughter was eligible for LEOFF II.[2] Based on the evidence before it, the court could hardly have concluded that the District had a duty to enroll him, or that it negligently failed to perform such a duty.

The Slaughters also contend that the District failed to provide them with access to certain public records. While they assert that their request to review records was "denied," they have not shown this to be the case. They were provided with the minutes of the May 18 meeting, and there is no evidence in the record that they were denied the opportunity to inspect or copy any other public record. *See* RCW 42.17.340.

Finally, Ruth Slaughter contends that the trial court erred in concluding that her dismissal was not based on unlawful sex discrimination. The court found, *inter alia,* that there was insufficient evidence of sex discrimination and that "[t]he real problem was nepotism." Both these findings are supported by the record. First, the Slaughters presented virtually no evidence to substantiate their claim of sex discrimination. Ruth Slaughter testified that she *felt* she was dismissed as volunteer fire captain for "discriminatory reasons," and Hubert Hale, a former commissioner, testified that he *felt* some of the fire fighters resented Ruth Slaughter in part because she was a woman. On the other hand, the testimony regarding Ruth Slaughter's lack of leadership and her abrasive personality, as well as the perception on the part of some that the Slaughter family wielded too much power in the District provided substantial evidence in support of the trial court's conclusion.

---

[2]At the time of trial, the District had requested an Attorney General Opinion as to Slaughter's eligibility.

Affirmed.

REVELLE and RINGOLD, JJ. Pro Tem., concur.

Review denied by Supreme Court May 31, 1988.