**FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for Liberty Bank of Seattle, Plaintiff,**

v.

**Sim HENDERSON, et al., Defendants.**

**J. Thomas WOOD; Barbara Wood, husband and wife, Defendants–Counter–Claimants–Plaintiffs–Appellants,**

v.

**Thomas OLDFIELD, Counter–Defendant–Appellee.**

No. 90–35499.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 1991.

Decided July 29, 1991.

Kathleen L. Albrecht, Culp, Guterson & Grader, Seattle, Wash., for defendants-counter-claimants-plaintiffs-appellants.

Betty Edwards, Asst. Atty. Gen., Olympia, Wash., for counter-defendant-appellee.

Before WIGGINS, BRUNETTI and NELSON, Circuit Judges.

WIGGINS, Circuit Judge:

Thomas Wood appeals the district court's order granting Thomas Oldfield's motion for summary judgment on Wood's § 1983 equal protection and due process claims. Wood argues on appeal that genuine issues of material fact exist as to each claim, making summary judgment inappropriate. The district court had jurisdiction under 12 U.S.C. § 1819(b)(2) and 28 U.S.C. § 1331. We have jurisdiction over this timely appeal under 28 U.S.C. § 1291, and we affirm.

## BACKGROUND

Thomas Wood was the President and CEO of Liberty Bank, a single-branch, minority-owned bank located in Seattle, from August 1984 until December 1987. Thomas Oldfield is the Supervisor of Banking for the State of Washington, a position he has held since November 1985. Wood, who is black, alleges that Oldfield's actions toward Wood and Liberty violated his rights to equal protection and due process. We recount the facts in some detail.

Liberty was chartered in 1968. In July 1984, the month before Wood took office, an examination by the Federal Reserve Bank ("FRB") indicated that Liberty was in fair condition; while the level of primary capital to total assets was adequate and "compare[d] favorably with the peer

group," the total amount of classified assets had more than doubled since the previous examination.[1] The report stated that "[m]anagement must take all necessary steps to reverse the decline in asset quality and ensure that extensions of credit are supported by adequate credit information and proper documentation."

Though the precise timing is not exactly clear, Wood determined early in his tenure that the Bank's position would be greatly improved if it could accomplish two things: (1) Wood and the Board wanted to open a downtown branch, in the hope of attracting more sizeable deposits and more favorable lending opportunities than its current low-income neighborhood could provide; and (2) they hoped to inject substantial capital into the Bank through a stock recapitalization plan. Both moves required the approval of the state Supervisor of Banking.[2] Neither request had been approved by the time Oldfield was appointed Supervisor in November 1985.

In June 1985, the FRB conducted another examination of Liberty. That report began by stating that "the overall condition of the bank has deteriorated and is now considered to be unsatisfactory." Classified assets totalled $1,524,000, or fully 100% of the Bank's capital funds. The FRB examiners concluded that:

[t]he unsatisfactory condition of the bank is a direct result of inadequate leadership and supervision by the Board of Directors and senior management, both past and present. Management must redirect its priorities and take more aggressive corrective action to improve the condition of the bank if long-term goals of expansion and service to the community are to be met.

The report further noted that the poor loan portfolio was "a direct result of unsound

---

1. In this context, a bank's assets are its loans. Loans that present repayment problems are "classified" by banks and regulators as substandard, doubtful or outright loss. The 1984 exam revealed that Liberty had $408,000 in classified assets, or 26% of the Bank's total capital. The quality of Liberty's assets and the proce-

dures followed by the Bank in making those loans are crucial issues in this case.

2. See Wash.Rev.Code § 30.04.405 (procedures for acquiring or changing control of bank), and Wash.Rev.Code § 30.40.020 (procedures for establishing new bank branch office).

lending practices and inadequate supervision of the lending area by management, both past and present," and concluded that the regulators would "need to meet with the board of directors to discuss the implementation of formal supervisory action."

In response to the Bank's declining status, Acting Supervisor of Banking Malmberg (Oldfield's predecessor) and officials from the FRB in San Francisco decided to adopt a coordinated regulatory approach to Liberty. The resulting Written Agreement, the terms of which were largely negotiated before Oldfield assumed office, was signed on December 17, 1985 by Wood, Oldfield and the Vice–President of the FRB of San Francisco. The Agreement was an aggressive, action-oriented plan designed to improve Liberty's loan evaluation and monitoring procedures, to place limits on the type and amount of loans it could make, and to institute management reforms. The ten members of Liberty's Board of Director's also signed the Agreement.

The record does not indicate that Oldfield denied Liberty's application to open a downtown branch on any particular occasion; apparently, the application, while never approved, was pending for the remainder of Wood's tenure at the Bank. Under state law, a bank with paid-in capital of $200,000 may, with the approval of the Supervisor, open a new branch office. Wash.Rev.Code § 30.40.020. The Supervisor's approval is expressly made to depend upon the ability of the proposed location to support the new office. It was Oldfield's contention that, while Liberty had the requisite funds, and while downtown Seattle surely could support a branch office, Liberty should not be allowed to open a new office until it had adequately addressed the concerns that the recent examinations had revealed, concerns that the tripartite Agreement addressed. By contrast, Wood contends that Oldfield's refusal to permit Liberty to open the branch office was motivated by racial animus; Wood alleges that

Oldfield once asked him who would bank with Liberty downtown—"After all, you're a minority bank." [3]

In October 1986, the FRB released the results of yet another examination of Liberty.[4] Again finding that the overall condition of the Bank was unsatisfactory, the report urged the directorate "to redirect its priorities away from expansion and concentrate its efforts toward restoring the bank to a satisfactory condition." As of September 1986, classified assets had climbed to 193% of the Bank's total capital. The report also noted that the Bank was in noncompliance with portions of the Written Agreement, mentioning especially that loans were being made in excess of the established limits and without proper documentation.

As Oldfield became increasingly concerned about the Bank's condition, he instructed State Bank Examiner John Burke, who was in charge of monitoring Liberty, to pay particularly close attention to Wood's actions. At one point in April 1987, Oldfield, noting that Liberty had "too many problems and poor management response," told Burke to "keep on Tom Wood's back ... Write down all conversations." In June 1987, Burke arranged to conduct another examination of Liberty, this one in conjunction with the FDIC. Again, there is no report in the record, but an Assistant Supervisor of Banking wrote in July 1987 that the examination indicated that "[t]he condition of the bank is precarious at best. If the problem loans, liquidity, and funds management deteriorate further, the bank could fail."

For several years, but especially during 1987, Wood, aware that the new branch application depended largely upon the Bank's need for capital infusion, worked to implement a stock recapitalization plan. On October 21, 1987, the Shamania Investment Company sent a letter to Wood, Andrew Branch and Jerome Crawford commit-

---

**3.** Wood also alleges that Oldfield inquired as to how the people from up on the Hill would locate the downtown office. Brief at 10. This, Wood claims, implied that only Blacks from the current neighborhood would bank with Liberty.

**4.** There was also a state examination conducted in March 1986. There is neither a written report nor any indication of the findings in the record.

ting to lend the three men $1,450,000. On October 27, Wood, Branch and Crawford sent a packet to Mary Faulk, the Director of Washington state's Department of General Administration (of which the Department of Banking is a part) containing Change of Ownership papers, offering to purchase $870,000 in Liberty stock, and a Branch Application. The men conditioned the stock purchase upon State approval of the branch application.

Documents accompanying the application indicated that the loan from Shamania was secured in part by Liberty Bank stock. Too, three sizeable Bank loans appear to have found their way into the escrow account that Wood, Branch and Crawford established to fund their purchase of Liberty stock. Oldfield argues in his brief that these and other facts concerned him because state law prohibits a bank from lending money to purchase its own stock. Wash.Rev.Code § 30.04.120.

Wood asserts in his brief that these concerns are in fact post hoc rationalizations by Oldfield for his refusal to grant the request for change of the Bank's control. The appellant further argues that Oldfield could not have known all of these facts until some time later. But whatever the state of Oldfield's knowledge of these facts at the time, no change of control of a bank may take place until thirty days after filing the appropriate documents, Wash.Rev.Code § 30.04.405, and before those thirty days were up, a new FRB examination revealed that the Bank was insolvent, and the application was never granted.

Early in November 1987, the FRB examiners arrived at Liberty to conduct an examination. Wood was apparently very upset by the exam, and on November 18 the Board of Directors held a special meeting to discuss possible litigation to stop the

examination. That same day, the Bank's attorney sent a letter to the FRB and Mary Faulk, requesting that the examination be suspended, and threatening to file a "Federal discrimination action on behalf of the Bank against the staff of the State Banking Division and the relevant Federal regulatory agencies."

Though the final report was not issued until February 29, 1988, the exam began on November 16, 1987. Oldfield spoke with the federal examiners in November and December, and so was aware of the exam's initial findings.[5] The FRB concluded that Liberty was "technically insolvent as a result of assets classified loss in a total amount which exceeds the bank's capital funds." [6] While somewhat critical of the Board of Directors, the report stated that:

> Management of the bank's affairs has been dominated by President Thomas Wood ... He has exerted an extraordinary and increasing degree of influence and control over all aspects of the bank's operations, and his unsatisfactory management has resulted in the bank's current insolvent condition.

The federal examiners also noted Wood's displeasure with their presence at the Bank, indicating that Wood told them that the large number of examinations at Liberty had been an enormous burden. Wood told the examiners that the frequent exams were part of a conspiracy to harass Liberty because it was a minority-owned bank. The report speculated that Wood's "largest concern was that the examination would uncover his inappropriate activities—rather than that it was an excessive burden."

In a December 8, 1987 memo to the file, Oldfield wrote that Branch and Crawford had informed him that they remained interested in recapitalizing the Bank, but that

**5.** Wood argues in his brief that Oldfield could not have acted in November and December on the basis of the findings of a report not issued until February. There is ample support in the record, however, for Oldfield's claim that he was made aware, through conversations with the federal examiners and members of his staff, of the initial findings.

**6.** The total amount of classified assets was $5,311,000, or 511% of the bank's total capital fund. The FRB found it "especially noteworthy" that some 40% of the total classified loans were made to individuals closely related to Wood. In reference to the stock recapitalization plan, the report noted that some of the loans were used by Wood and others to subscribe to a substantial amount of a new issue of bank stock.

they were greatly concerned by Wood's reaction to the federal exam. They said that while Wood was not likely to resign, the Board would "respond to a strong push from the state." Because of their comments, and because Oldfield was convinced that "the results of [the FRB] examination are going to require quick and decisive action," the Supervisor decided to pressure the Board of Directors to change management, and to indicate that he was prepared to utilize administrative procedures to terminate Wood if necessary.

The end came quickly. On December 21, 1987, Oldfield met with the Board of Directors (Wood, a Board member, was present) to tell them about the FRB's findings. Without specifying, Oldfield told the Board that he wanted action by the following Tuesday or he would begin the process of taking the Bank over and appointing a conservator. On December 22, Oldfield met with two Board members, and told them that they should ask for Wood's resignation. The following day, the two members related Oldfield's ultimatum to the Board, and noted that Oldfield and several Board members were concerned about the source of funds for Wood's stock purchase plan. Wood, who was at that meeting, refused to resign, noting, with apparent reference to the state administrative procedures,[7] that Oldfield could not "send any Marshall in here to do anything to me without first having facts to accuse me and secondly, there is a 10–20 day period to prove it or me disprove it."

On December 27, a quorum of the Board of Directors "Resolved, that J. Thomas Wood be terminated for cause ... as of the conclusion of the meeting."[8] The Resolu-

tion listed three causes for the termination: (1) failure to follow Bank policy in making loans; (2) failure to bring the Bank into compliance with a Supervisory Directive issued in July 1987;[9] and (3) the injury that those failures caused to the Bank's interests. The following day, Oldfield met with members of the Board to discuss the Bank's future and to coordinate their public statements. The Supervisor gave his commitment that the new branch would be approved after the Bank's capitalization needs were met.

Early in January 1988, Oldfield contacted attorneys at the banking fraud section of the U.S. Attorney's Office to report the lending irregularities that led to Wood's termination. On January 20, the State appointed William Rhodes as conservator in an attempt to save the Bank. When those efforts proved unavailing, the FDIC moved in and closed the Bank in June 1988. That same month, a new minority-owned bank, Emerald City Bank, was opened with the full support of the State. Its president, Ray Merriwether, was a member of Liberty's Board of Directors, Emerald opened a downtown branch once it acquired the requisite capital infusion.

In March and April 1988, Liberty filed a complaint for money due and to recover on several loans against Wood and several of the loan recipients in Washington state court. Wood filed a counterclaim alleging defamation, and added claims under § 1983 for civil rights violations against Oldfield, Rhodes, Merriwether and Joyner, the former Chairman of Liberty's Board. When the FDIC was appointed receiver of the Bank, it removed the lawsuit to federal court under 12 U.S.C. § 1819(b)(2). After

7. See Wash.Rev.Code § 30.12.040 et seq. (authorizing the Supervisor to remove bank officers upon written notice indicating the grounds for removal and the date for the hearing, which hearing may not be earlier than ten days after the notice).

8. Wood's employment contract with the Bank provided:
"8. *Termination.* This Agreement shall be terminated upon the occurrence of any one of the following events:
——
——

8.3. By Employee, upon Employer receiving ninety (90) days' notice ..., and by Employer, without cause, upon Employee receiving ninety (90) days written notice ...
8.4. Immediately by Employer for cause."
"Cause" is defined as including a breach of the Agreement, illegal activity, and misconduct injurious to the Bank's interests.

9. The Supervisory Directive was issued by the State in response to the Bank's failure to abide by the Written Agreement it signed with the State and the FRB.

the FDIC dismissed its claims against Wood, the district judge granted Oldfield's motion for summary judgment on Wood's § 1983 claims, and remanded the state law claims to state court. Wood timely appealed the district court's order granting summary judgment.

## DISCUSSION

We review a grant of summary judgment de novo. *Kruso v. Int'l Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). The district court must grant summary judgment if the judge determines "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We ask, viewing the evidence in the light most favorable to the appellant, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989).

### A. WOOD'S EQUAL PROTECTION CLAIM

■ Wood alleges that Oldfield's actions toward him and Liberty were motivated by racial discrimination. The plaintiff in a § 1983 claim alleging a violation of equal protection must prove that the defendant acted in a discriminatory manner and that the discrimination was intentional. *Stones v. Los Angeles Comm. College Dist.*, 796 F.2d 270, 275 (9th Cir.1986); *Lowe v. City*

*of Monrovia*, 775 F.2d 998, 1011 (9th Cir. 1985), *as amended*, 784 F.2d 1407 (1986). Discriminatory intent may be proved by direct or indirect evidence. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Lowe*, 775 F.2d at 1010. Beyond this requirement of showing intentional discrimination, however, there is no specific test that an equal protection plaintiff is required to meet,[10] and in order to survive a motion for summary judgment by the defendant, a plaintiff must only produce evidence sufficient to establish a genuine issue of fact as to the defendant's motivations.

■ The appellant argues that this § 1983 claim is supported by both direct and indirect evidence. As direct evidence, Wood relies upon Oldfield's alleged skepticism that a downtown office of Liberty would prosper; in his Affidavit in Opposition to Oldfield's Motion for Summary Judgment, Wood states:

> After Oldfield became the Supervisor, he continued the discriminatory policies of his predecessor. He too was opposed to Liberty Bank expanding beyond the Central Area and asked me, "Who's going to bank with you downtown? After all, you're a minority bank." He also inquired as to how the people from up on the Hill would find Liberty downtown; how they were going to get downtown.[11]

While Wood characterizes other parts of the record as direct evidence of racial discrimination, the above statement is the only

---

10. This differs somewhat from, for example, Title VII actions. There, the plaintiff generally must satisfy the four-pronged test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Even that test, however, is less than rigid. *Id.* n. 13; *see also Lowe*, 775 F.2d at 1006 ("a [Title VII] plaintiff can establish a prima facie case of disparate treatment without satisfying the *McDonnell Douglas* test").

11. Wood claims that Oldfield treated him with "overt racial animus and hostility." Yet with this one exception, Wood does not point to any action or statement by Oldfield that would support such a charge. Wood repeatedly asserts that Oldfield treated him as a "black man who

would not stay in his 'place'." The statements upon which that charge is based, however, are attributed either to Mr. Malmberg, or to no one at all. We are especially hard-pressed to imagine how Wood's statement that "[a] white loan officer testified that she heard examiners referring to Liberty's employees as 'slimy niggers' " would assist this Court in determining whether Oldfield's actions were racially motivated. This is especially the case because the "white loan officer" testified that the comment was made by a *federal* examiner. While we take seriously such allegations as can be tied to Oldfield himself, we note that Wood cannot impute to the appellee racist motives simply by conjuring a generalized, largely-unattributed specter of racism.

one both that is attributable to Oldfield and probative of the question of racial motivation.[12] As for the indirect evidence of racial discrimination, the district court quite reasonably interpreted Wood's reference to "the overwhelming evidence of Oldfield's pattern of harassing and arbitrary actions towards Wood" to be based on three main grounds: (1) the burdensome task of accommodating and complying with unusually frequent bank examinations; (2) Oldfield's refusal to approve the branch application; and (3) Oldfield's involvement in Wood's termination.

The district court, relying on a First Circuit case for authority,[13] analyzed Wood's equal protection claim under the *McDonnell Douglas*/Title VII framework. Finding both that Wood "has not carried his burden of demonstrating a prima facie case of racial discrimination in the regulation of Liberty Bank," and that "Oldfield has demonstrated substantial legitimate nondiscriminatory reasons for his actions"—which reasons Wood did not show to be mere pretexts for discrimination—the court granted Oldfield's motion for summary judgment on the equal protection claim.

■ The appellant argues that the district court erred in applying the rigid Title VII analytical framework to his equal protection claim. While it may be true that, in some class of cases, a plaintiff who does not satisfy the *McDonnell Douglas* test may nonetheless state a claim for intentional racial discrimination under the equal protection clause, our cases indicate that there is a very close relationship between the two claims.[14] Whether the proper standard is *McDonnell Douglas* or some more lenient test, however, Wood has failed to produce evidence that would permit a trier of fact reasonably to conclude by a preponderance of the evidence that Oldfield's actions constitute intentional racial discrimination.

■ To begin with the indirect evidence, we find Oldfield's regulatory actions toward Liberty to be utterly devoid of even a hint of discriminatory intent. From November 1985, when Oldfield took office, until Wood's termination, the state examiners conducted two examinations of Liberty.[15] Under state law, the Banking Division is required to examine each bank once every eighteen months, and it may do so

**12.** For example, Wood asserts that Oldfield's "hypersensitivity" to the "Black bank" issue is direct evidence of racial animus. Again, however, having reviewed the record citations in support of this claim, we find them wholly unsupportive of Wood's claim. For the most part, the statements are either unattributed or expressly made by someone other than Oldfield. Moreover, we do not think that one can reasonably draw an inference of racism from the fact that a state official is concerned about how his actions regarding a minority-owned bank will be viewed by the public.

**13.** The case was *T & S Service Associates, Inc. v. Crenson*, 666 F.2d 722, 724 (1st Cir.1981) (holding that the *McDonnell Douglas* principles are applicable to both § 1981 and § 1983 claims); *see Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1112 (9th Cir.1991) (citing *T & S Service* with approval).

**14.** We have found no analogous Supreme Court or Ninth Circuit case discussing intentional racial discrimination under the equal protection clause that does not also include a Title VII claim. Our cases make clear, however, that the status of the § 1983 equal protection claim generally depends on the outcome of the Title VII analysis. *See Sischo–Nownejad*, 934 F.2d at 1112–1113 ("A plaintiff who fails to establish

intentional discrimination for purposes of Title VII ... also fails to establish intentional discrimination for purposes of § 1983."); *Lowe*, 775 F.2d at 1010–11 (plaintiff who established a triable issue of fact regarding intentional discrimination under Title VII was therefore entitled to proceed with § 1983 equal protection claim); *Stones*, 796 F.2d at 275 (because plaintiff did not establish racial discrimination under § 1981 using *McDonnell Douglas* test, relief under § 1983 was likewise foreclosed); *Peters v. Lieuallen*, 746 F.2d 1390, 1393 (9th Cir.1984) (because plaintiff failed to establish intentional discrimination under Title VII, claims under §§ 1981 and 1983 must also fail).

**15.** We are aware that Liberty was subjected to more than two examinations during this period, but we are only concerned here with examinations that can be attributed to Oldfield—that is to say, with state examinations that took place during Oldfield's tenure as Supervisor. There were two such state examinations, in March 1986 and June 1987. The fact that state examiners were present during the federal examinations is irrelevant; whatever obstacles these federal examinations created are attributable to the FRB, and Wood does not allege that the mere presence of state employees made the federal examinations any more burdensome.

"oftener [sic] if necessary." Wash.Rev. Code § 30.04.060. Given these legal requirements and the objectively troubled condition of the Bank, two examinations was surely a reasonable amount.

Likewise, Oldfield's connection with Wood's termination by the Board of Directors does not support an inference of discriminatory intent. The grave concerns about the legality of the stock purchase scheme aside, it was the Supervisor's contention that Liberty had no hope of acquiring the necessary capital infusion while Wood was in charge. Especially in light of the 1987 FRB examination results, Oldfield believed that no reasonable investor would entrust funds to a Bank that federal and state regulators considered to be extremely poorly managed. Absent any direct indication that Oldfield's decision to seek Wood's removal was racially motivated, we do not find this evidence to be probative of Oldfield's alleged discriminatory intent.

■ Lastly, we consider Oldfield's refusal to authorize Liberty to open a branch office in downtown Seattle. Unlike Wood's other allegations, this contention is accompanied by direct evidence that Wood argues establishes a genuine factual question as to Oldfield's motivations. While we agree that Oldfield's statement—"Who's going to bank with you downtown? After all, you're a minority bank."—might support an inference of discriminatory intent, that does not end our inquiry. In order to defeat Oldfield's motion for summary judgment, Wood had the burden of producing evidence sufficient to create a genuine factual question as to Oldfield's motivations. A factual dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In the context of this case, Wood must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that Oldfield's decision not to authorize the branch opening was racially motivated. Especially given the context in which the statement was made, we find that Wood has failed to meet that burden.

Oldfield had a legitimate reason for refusing to authorize the opening of a branch office downtown. Examinations dating from before his tenure as Supervisor indicated that the Bank had serious liquidity and managerial problems. It was entirely reasonable for Oldfield to demand that those problems be addressed before permitting the Bank to expand its operations. In light of this fact, we do not find the statement attributed to Oldfield to be sufficient evidence to create a genuine issue of fact as to his motivations in refusing to approve the branch application.[16]

---

**16.** There is language in *Lowe*, upon which Wood does not expressly rely, to support the proposition that summary judgment is not available against a plaintiff who alleges direct evidence of the defendant's racial discrimination. *Lowe*, 775 F.2d at 1009 (statement by defendant from which discriminatory intent can be inferred "necessarily ... raise[s] a genuine issue of material fact with respect to the legitimacy or bona fides of the employer's articulated reason for its employment decision"); *see also Sischo–Nownejad*, 934 F.2d at 1110–1112. However, *Lowe*, was subsequently amended to indicate that the Court did not mean to "prevent the summary disposition of meritless suits but simply ensure that when a material fact exists a civil rights litigant will not be denied a trial on the merits." *Lowe v. City of Monrovia*, 784 F.2d 1407 (9th Cir.1986), *amending* 775 F.2d at 1009. The relevant standard, then, is whether, viewing the evidence in the light most favorable to Wood, there exists a genuine issue as to whether Oldfield purposefully discriminated against Wood on the basis of race.

In both *Lowe* and *Sischo–Nownejad,* the plaintiff produced substantial circumstantial evidence of disparate treatment in addition to the direct evidence attributed to the defendants. *Lowe,* 775 F.2d at 1007 (alleged statements, *"when viewed in conjunction with* the fact that no Blacks were employed by the Monrovia Police Department at the time Lowe applied, create an inference of discrimination sufficient to establish a *prima facie* case.") (emphasis added); *Sischo–Nownejad,* 934 F.2d at 1112 ("the fact that stereotyped remarks were made by Sischo–Nownejad's superiors at the same time that they were subjecting her to less favorable working conditions is sufficient to raise an inference of discriminatory intent."). Here, we have only the one statement by Oldfield, and we find that that statement alone is insufficient to satisfy Wood's burden of production.

474

To hold otherwise would be to make summary judgment unavailable in all cases where the plaintiff has alleged direct evidence of discriminatory intent. Aside from the troubling practical implications of such a holding, we find no authority for creating a presumption whereby a plaintiff is held to have established a genuine factual issue merely by alleging direct evidence. In analyzing a motion for summary judgment, the district court reviews the evidence to determine not merely whether there is a factual dispute between the parties, but whether there is a *genuine* factual dispute. An allegation of direct evidence will almost always assist a plaintiff in meeting this burden, but such an allegation does not eliminate the genuineness requirement.

In short, the evidence offered by Wood does not support an inference that Oldfield's actions toward Liberty were racially motivated, and indeed his actions were eminently reasonable in light of the increasingly negative reports on the Bank's condition. There being no genuine issue of material fact, the district judge properly granted Oldfield's motion for summary judgment on the equal protection claim.

## B. WOOD'S SUBSTANTIVE DUE PROCESS CLAIM

Wood alleges that Oldfield's actions violated his substantive due process right to pursue the occupation of his choice. In order to state such a substantive due process claim, Wood must show, first, that he is unable to pursue a job in the banking profession, and second, that this inability is due to actions that were "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Lebbos v. Judges of Super. Ct., Santa Clara County*, 883 F.2d 810, 818 (9th Cir.1989) (citation omitted); *see also Benigni v. City of Hemet*, 879 F.2d 473, 478 (9th Cir.1988).

We have already detailed the substantial objective evidence of the Bank's poor and deteriorating condition. In light of that evidence, upon which Oldfield justifiably relied, it cannot be maintained that his actions were arbitrary or unreasonable. Be-

cause there are no genuine factual disputes concerning this claim, the district court properly granted Oldfield's motion for summary judgment.

## C. WOOD'S PROCEDURAL DUE PROCESS CLAIM

Wood also alleges that Oldfield's actions deprived him of liberty and property interests without due process of law. The appellant claims that he has been deprived of a liberty interest in his reputation and the right to pursue the profession of his choice, and of a property interest in his continued employment as President of Liberty. He contends that he was entitled to procedural protections before being deprived of these interests.

In addition to asserting that these claims are substantively without merit, Oldfield also argues that he has qualified immunity from damages arising from any violation. The Supreme Court has recently held that, in analyzing a claim of qualified immunity, a lower court is to determine first whether the complaint "allege[s] the violation of a clearly established constitutional right." *Siegert v. Gilley*, —— U.S. ——, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Accordingly, we begin our inquiry by analyzing whether Wood's procedural due process claims allege the violation of one or more clearly established constitutional rights.

"The Fourteenth Amendment protects against the deprivation of property or liberty without due process." *Brady v. Gebbie*, 859 F.2d 1543, 1547 (9th Cir.1988), *cert. denied*, 489 U.S. 1100, 109 S.Ct. 1577, 103 L.Ed.2d 943 (1989). Wood argues that Oldfield's actions in relation to the regulation of the Bank deprived him of both a liberty and property interest. We must determine whether these alleged deprivations concern a clearly established constitutional right.

### 1. *Property interest*

Wood bases his claim of a protected property interest in his continued employment with Liberty on two independent sources. First, he argues that the statutory procedures authorizing the Supervisor to remove bank officers only for certain

delineated causes create a property interest. Under Wash.Rev.Code § 30.12.040–042, the Supervisor is required to provide written notice of his intention to remove the officer, setting a hearing date no sooner than ten days later. Additionally, § 30.04.470 provides that any party may obtain review of the result of these procedures in state court. And second, the appellant contends that his contract with the Bank created such an interest. Under that contract, he could be terminated either at will with ninety days notice, or immediately for cause.

■ A person "only has a constitutionally protected property interest in continued employment ... if he has a reasonable expectation or a 'legitimate claim of entitlement' to it, rather than a mere 'unilateral expectation.'" *Brady*, 859 F.2d at 1547–48 (citing *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). To determine whether an entitlement exists, a court looks to "existing rules and understandings that stem from an outside source such as state law." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. But while the underlying right is created by state law, "federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978) (citations omitted).

a. State procedures for removing bank officer

■ Wood first argues that he had a protected property interest in not having Oldfield effect his removal without following the procedures set forth in the state laws authorizing him to do so. While it is true that, under Washington state law, "there is no general due process right to have states adhere to procedural rules which they establish," *Punton v. Seattle Public Safety Com'n*, 32 Wash.App. 959, 650 P.2d 1138, 1143 (1982), *review denied*, 98 Wash.2d 1014 (1983), "regulations which impose limits on state authority or confer

substantive right [sic] create interests protected by due process." *Id.* In this case, the state regulations clearly imposed limits on the circumstances under which Oldfield could terminate Wood as president of Liberty—i.e. only after notice, a hearing, and with judicial review. And because protected interests are created by reference to, among other things, state law, *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709, it appears that Wood has asserted a cognizable property interest based on the state procedures.

■ To say that such an interest exists, however, is not to say that it is entitled to federal constitutional protection. *See Memphis Light*, 436 U.S. at 9, 98 S.Ct. at 1560 (while state law creates interest, "federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause"). In *Dorr v. County of Butte*, we held that "a substantive property right cannot exist exclusively by virtue of a procedural right." 795 F.2d 875, 877 (9th Cir.1986); *see also Sebra v. Neville*, 801 F.2d 1135, 1142 (9th Cir.1986). It follows that, while state law may create an interest in having officials adhere to state procedures, those procedures alone do not give rise to a "legitimate claim of entitlement" that is subject to the protections of the federal due process clause. Accordingly, Wood's allegation that Oldfield deprived him of a property interest arising from the state banking procedures fails to allege the violation of a clearly established constitutional right.

b. Employment contract

■ Wood also argues that he had an independent property interest by virtue of his employment contract with the Bank. In Washington, as in most states, the general rule is that a *public employee* terminable at will does not have a property interest in continued employment, while an employee whose contract provides, either expressly or by implication, that he may only be terminated for cause does have such an interest. *Danielson v. City of Seattle*, 108 Wash.2d 788, 742 P.2d 717, 721 (1987); *Slaughter v. Snohomish County Fire Pro-*

## Page 476

tection Dist. No. 20, 50 Wash.App. 733, 750 P.2d 656, 659, review denied, 110 Wash.2d 1031 (1988); Roley v. Pierce County Fire Protection Dist. No. 4, 869 F.2d 491, 494 (9th Cir.1989). And it is well-established that a property interest created by an employment contract requiring for-cause termination is an interest protected by the federal constitution. Brady, 859 F.2d at 1548; Merritt v. Mackey, 827 F.2d 1368, 1371 (9th Cir.1987). The question we must decide is whether these same principles apply to Wood's contract with Liberty, a private employment contract that provided for both termination at will and termination for cause.

We have held that "[i]t is indisputable that an individual may have a protected property interest in private employment." Merritt, 827 F.2d at 1370. In Merritt, government officials told a private alcohol abuse treatment center that they would cut off federal and state funding unless the center fired Merritt. The center fired him, and he in turn sued the officials, claiming that they deprived him of a property interest in continued employment without due process.

The Court held that "where government officials are involved [in the termination], the nature of the interest at stake in private employment is a property interest." Id. at 1371; see also DiMartini v. Ferrin, 906 F.2d 465, 466 (9th Cir.1990), amending 889 F.2d 922 (9th Cir.1989), cert. denied, —— U.S. ——, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991). The fact that the private employer and not the governmental officials actually fired the plaintiff did not shield the officials from liability, because they "set[ ] in motion a series of acts by others which [they knew] or reasonably should [have known] would cause others to inflict the constitutional injury." Merritt, 827 F.2d at 1371 (quoting Johnson v. Duffy, 588 F.2d 740, 743–44 (9th Cir.1978)). And because Merritt's contract could only be terminated for cause, we held that he had stated a "claim under section 1983 that he was deprived of his property interest in continued employment when the ... agents intentionally coerced [the center] to fire him." Id. at 1372.

Oldfield argues that, because Wood's contract contained an at-will provision, it gave rise to no protected property interest. We think this interpretation of Wood's contract is too simplistic. It is true that the contract contains an at-will provision, but that provision required that Wood be given ninety days notice if he was to be terminated pursuant to it. In a very real sense, then, this was a conditional at-will provision, one that could only be exercised if accompanied by the requisite notice.

That is not to say, however, that Wood's contract was a for-cause employment contract. Instead, Wood had a hybrid contract that combined a for-cause provision with a conditional at-will provision. As such, it only gave rise to a "legitimate claim of entitlement" to ninety days of continued employment. Each day during his tenure with Liberty, the Bank had the option of giving Wood notice, and ninety days after receiving such notice, Wood had no legally cognizable property interest in continued employment. Put another way, Wood could only be terminated within that ninety-day period for cause; after that period, his contract gave rise to no protected property interest.

We hold, then, that Wood had a protected property interest in his employment contract with Liberty Bank, but that his interest was limited to ninety days of employment. We further hold, under Merritt, that Oldfield's actions in relation to Wood's termination deprived Wood of that property interest without due process. It remains for us to determine whether Wood's right to be free from such an unconstitutional deprivation was established with sufficient clarity at the time Oldfield acted to overcome the grant of qualified immunity.

Under Washington state law, Oldfield was covered by the following grant of immunity:

Neither the Supervisor of Banking, any Deputy Supervisor nor any bank examiner shall be personally liable for any act

done by him in good faith in the performance of his duty.

Wash.Rev.Code § 43.19.030. The good-faith limitation on this grant of immunity comports with well-established case law:

> Government officials who perform discretionary functions are protected from liability for civil damages as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Lum v. Jensen,* 876 F.2d 1385, 1386 (9th Cir.1989) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)), *cert. denied,* — U.S. ——, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990). Governmental "officials are charged with knowledge of constitutional developments at the time of the alleged constitutional violation, including all available case law." *Id.* at 1387. Whether an official enjoys qualified immunity is a purely legal question. *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985).

■ While it is true that, under *Merritt,* Oldfield is chargeable with the knowledge that his involvement in Wood's termination might implicate federal procedural due process protections, we have found no case law in this or any other circuit addressing the question whether an employee has a protected property interest arising from an employment contract that provides for both at-will and for-cause termination. In a recent case, we described as "dichotomous" the normal approach to the question whether an employment contract gives rise to a property interest; at-will contracts do not create such an interest, while contracts containing for-cause provisions do. *Wheaton v. Webb–Petett,* 931 F.2d 613, 619 (9th Cir.1991). In *Wheaton,* we analyzed the plaintiff's contract with the Oregon management service, and held that "[t]he dichotomous reasoning that characterizes the cases [is] ill-adapted to predicting the treatment of a hybrid employment like Wheaton's." *Id.* Accordingly, we held that "Wheaton's property interest would

not have been apparent to a reasonable official in Webb–Petett's situation." *Id.*

Likewise, in this case, it was not clearly established that an employment contract containing both for-cause and a conditional at-will termination provisions created even a limited property interest. As such, Oldfield had no way of knowing that his actions would deprive Wood of this property interest. Because this constitutional right was not clearly established when Oldfield set in motion the events which led to Wood's termination, he is entitled to the immunity from damages that accompanies his official position.

*2. Liberty interest*

■ Wood also argues that Oldfield's actions deprived him of a liberty interest in his reputation and his ability to pursue his profession. "An individual has a liberty interest in employment protected by the Due Process Clause if the dismissal is 'for reasons that might seriously damage his standing in the community,' ... or if the dismissal effectively precludes future work in the individual's chosen profession...." *Merritt,* 827 F.2d at 1373 (citations omitted). Only the stigma of dishonesty or moral turpitude gives rise to a liberty interest; charges of incompetence do not. *Roley,* 869 F.2d at 495; *Brady,* 859 F.2d at 1552. One deprived of such an interest must show that "1) the accuracy of the charge is contested; 2) there is some public disclosure of the charge; and 3) the charge is made in connection with termination of employment." *Matthews v. Harney County Or., School Dist. No. 4,* 819 F.2d 889, 892 (9th Cir.1987).

■ Fatal to Wood's claim that Oldfield deprived him of a protected liberty interest is the fact that none of the public pronouncements for which Oldfield was responsible can be said to impugn Wood's morality or question his honesty. The two press releases issued by Oldfield, in January 1988 and in June 1988 attribute the problems at Liberty to poor management and bad loans. Wood's name is not mentioned in either release. The news stories that discuss the lawsuit brought by Liberty

against Wood are based on information provided by John Burke, and there is simply no evidence that Oldfield instructed Burke to release that information to the press. As such, there are no genuine factual disputes, and the district judge properly awarded Oldfield's motion for summary judgment.

## CONCLUSION

We hold that there are no genuine issues of material fact as to any of Wood's claims against Supervisor Oldfield. Accordingly, the district court's order granting Oldfield's motion for summary judgment is AFFIRMED.